### UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF LOUISIANA

**GEORGE W. ROBINSON, JR., ET AL.**

                                    **CIVIL ACTION**

**v.**

                                    **NO. 13-375-JWD-RLB**

**CITY OF BATON ROUGE AND THE
PARISH OF EAST BATON ROUGE, ET
AL.**

### RULING AND ORDER

This matter is before the Court on the *Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 Filed by City of Baton Rouge/Parish of East Baton Rouge* (Doc. 62) submitted by the Defendants, the City of Baton Rouge/Parish of East Baton Rouge ("City/Parish") and the Planning and Zoning Commission for the City of Baton Rouge/East Baton Rouge Parish ("Planning Commission") (collectively, the "Defendants"). The Plaintiffs George W. Robinson, Jr., and Demetra Parson Robinson (collectively, the "Plaintiffs") oppose the motion. (Doc. 73.) Oral argument is not necessary.

Having carefully considered the law, facts in the record, and arguments of the parties, the motion is granted in part and denied in part.

I.      **Introduction and Summary of Rulings**

The Plaintiffs are real estate developers who attempted to develop a subdivision within the City/Parish. Pursuant to state and local law, they submitted a preliminary plat for approval to the City/Parish's Planning Commission. The Planning Commission denied approval. This suit ensued.

The Plaintiffs claim they suffered a number of violations of their federal and state constitutional rights. Specifically, the Plaintiffs assert (1) an inverse condemnation claim under

the Fifth and Fourteenth Amendments; (2) an unconstitutional taking claim under Article I,

Section 4 of the Louisiana Constitution; (3) a substantive due process claim under the Fourteenth

Amendment; (4) a claim for denial of procedural due process under the Fourteenth Amendment;

and (5) a claim under 42 U.S.C. § 1983 under *Monell v. Department of Social Services,* 436 U.S.

658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  The Defendants seek to have each of these claims

dismissed.

The Court has carefully reviewed the briefs and evidence submitted by the parties as well

as the applicable law.  Having done so, the Court makes the following rulings:

The Court grants the Defendants' motion with respect to the substantive due process

claim.  The Court finds that all reasonable jurors would conclude that the reasons for the

Planning Commission denying approval of the preliminary plat were the commissioners'

concerns about issues like fill mitigation/elevation, flooding, and drainage.  The Court further

finds that, as a matter of law, these reasons were rationally related to legitimate governmental

interests like public health, safety, and the general welfare.  As a result, the Plaintiffs'

substantive due process claim fails.

The Court also grants the Defendants' motion with respect to the procedural due process

claim.  The key issue here is whether, as a matter of state law, the Plaintiffs' had a legitimate

claim of entitlement to approval of their preliminary plat.  This question turns on whether the

Planning Commission had discretion, which turns on whether it was very likely or certain the

Plaintiffs would receive approval.  State law recognizes that the Planning Commission has

discretion if it does not act arbitrarily and capriciously and bases its decision on legitimate

reasons.  Since this Court has determined that the Planning Commission did not act arbitrarily

and capaciously and did in fact base its decision on legitimate reasons, the Planning Commission

had discretion to deny approval.  That is, as a matter of state law, it was not certain or very likely the Plaintiffs would receive approval, so they had no legitimate claim to entitlement. Consequently, the Plaintiffs cannot prevail on their procedural due process claim.

The takings claims are ripe.  A takings claim is not ripe (1) until the relevant governmental unit has reached a final decision as to what will be done with the property, and (2) until the plaintiff has sought compensation through whatever adequate procedures the state provides.  As to the first requirement, the Planning Commission reviewed the Plaintiffs' preliminary plat, sought additional information, was provided same, and then rendered a final decision denying approval.  The Defendants have not identified an avenue (be it through regulation or law) that the Plaintiffs should have pursued but did not.  The Defendants argue the Plaintiffs should have sought judicial review, but the Plaintiffs did in fact seek a mandamus, which this Court denied.  Thus, The Plaintiffs obtained a final decision from the Planning Commission.  As to the second ripeness requirement, the Defendants have waived any objection to it by removing the Plaintiffs' state court inverse condemnation proceeding to this Court. Accordingly, the Defendants' ripeness arguments are rejected.

However, the Court grants the Defendants' motion with respect to the Plaintiffs' categorical takings (*Lucas*) claim.  To prevail, the Plaintiffs must show that they lost *all value* in the property.  In short, they did not.  The Plaintiffs sold their property for over one million dollars.  No reasonable juror would find that they lost all value.  Further, even if the relevant question was whether the Plaintiffs had *any* economic *use* of their property, their claim would still fail.  It is undisputed they obtained preliminary plat approval to build a subdivision on part of the property at issue.  Thus, under either standard, the Plaintiffs' claim fails.

Nevertheless, the Court finds that there are genuine issues of material fact precluding summary judgment on the Plaintiffs' as applied takings claim. The viability of this claim depends on the factors set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978), which include (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with distinct investment backed expectations, and (3) the character of the government action. The Plaintiffs have submitted evidence such that a reasonable juror could find that the first two factors weigh in their favor. While the third factor weighs in favor of the Defendants, this merely demonstrates how this fact-intensive question is best decided by a jury.

The Court also denies the Defendants' motion with respect to the *Monell* claim. Under Fifth Circuit case law, a plaintiff may establish a policy based on an isolated decision if the decision was made by an authorized policymaker in whom final authority rested regarding the action ordered. Here, the Planning Commission was a policymaker for § 1983 purposes, and its decision to reject that Plaintiffs' preliminary plat constituted a policy under the above standard. Further, this action was the driving force of the surviving alleged constitutional violation. Accordingly, the *Monell* claim survives.

Lastly, the Court denies summary judgment as to the state law takings claim. Under Louisiana law, a regulatory taking occurs when a regulation destroys a major portion of the property's value or eliminates the practical economic uses of the property. Here, the Plaintiffs have submitted evidence demonstrating that their property lost about $1.3 million worth of value. A reasonable juror could conclude, even with the sale of most of the property, that the Plaintiffs were denied *a major portion* of the property's value.

## II.    Factual Background[1]

### A.  The Parties

Plaintiffs George W. Robinson, Jr., and Demetra Parson Robinson are real estate developers who have developed numerous subdivisions in East Baton Rouge Parish and the surrounding parishes over the past thirty-five years. (*See* Doc. 73-10 at 1.)  The Plaintiffs owned a 101.96 acre tract of land within the City/Parish. (*See id.* at 2.)

The Defendant Planning Commission is an entity created pursuant to Louisiana Revised Statute 33:101 *et seq.* (Doc. 62-2 at 1; Doc. 73-1 at 1.)  The Planning Commission is charged with, among other things, the responsibility to review and approve of subdivision plats. (Doc. 62-2 at 1; Doc. 73-1 at 1.)

### B.  The Unified Development Code

#### 1. The Unified Development Code and Subdivisions Generally

In 1996, the East Baton Rouge Parish Metropolitan Council, which is the governing authority for the City/Parish, adopted the Unified Development Code ("UDC"), which consolidated into one volume all existing regulations related to land development within the Parish of East Baton Rouge. (Doc. 62-2 at 1; Doc. 73-1 at 1—2.)  While not facts per se, the Court finds that an overview of the UDC will be useful in framing the issues of this ruling.

The UDC provides in its opening paragraph:

> In accordance with the provisions of R.S. 33:101 et seq., and particularly R.S. 33:112, and in order to promote the health, safety, convenience, morals, and general welfare of the community, to ensure orderly development of property; provide for the proper arrangement, width, naming of streets in relation to other

---

[1] The *Statement of Material Facts* (Doc. 62-2) and the *Plaintiffs' Local Rule 56(B) Statement of Disputed Facts Precluding Summary Judgment as to Defendants' Motion for Summary Judgment* (Doc. 73-1) demonstrate that the parties agree on a considerable number of facts.  However, they dispute the significance of many of those facts.  For instance, while Plaintiffs admit that certain facts are undisputed, they maintain that they are merely "historical." (Doc. 73-1 at 9.)  Nevertheless, the Court has attempted to include a majority of the undisputed facts in this section.  Their significance will be discussed later in the opinion, as needed.

existing or planned streets that provide adequate and convenient traffic circulation including access for emergency vehicles; and ensure the adequacy of vehicular parking, utilities, and open space and recreation facilities, the following regulations are adopted by the Planning Commission.

(UDC § 1.1, Doc. 73-2 at 1, *also available at*

https://brgov.com/dept/planning/udc/pdf/UDC_2016.pdf).  The UDC further provides:

no subdivision . . . which is in conflict with the Master Plan or the Unified Development Code shall be constructed or authorized by the appropriate department of the City Parish government, until and unless the locations and extent thereof shall have been submitted to and approved by the Planning Commission and where appropriate, Zoning Commission.

(UDC § 3.04(B), Doc. 73-2 at 5.)

## 2. Overview of Subdivision Regulations

Section 4.102 of the UDC is entitled "Subdivision Review and Procedures." (Doc. 73-2 at

9.)  Under this regulation, an applicant first presents prints of a proposal to staff at a pre-

application conference, and the staff "informs the applicant of procedures and required items

necessary to complete the application package and review Preliminary Plat Checklist items."

(UDC § 4.102(A), Doc. 73-2 at 9.)  The UDC then provides the following concerning

preliminary plans:

After a conference with the Planning Commission staff, the applicant shall submit the required application package to the Subdivision Coordinator of the Planning Commission, who will check the preliminary plan for compliance with the geometric standards and the preliminary plan requirements. Before the Planning Commission approves a request to subdivide property, there should be accurate and complete information submitted by the applicant to the Office of the Planning Commission which will assure that the proposed subdivision meets all the requirements of the Unified Development Code. . . . The Planning Commission staff and the Department of Public Works shall review all major and minor subdivision requests.

(UDC § 4.102(B), Doc. 73-2 at 9.)

6

The Planning Commission "shall hold a public hearing on all major subdivisions and minor subdivisions with waivers." (UDC § 4.102(C), Doc. 73-2 at 9.) "Upon approval by the Planning Commission, the Planning Director or his designee will return to the applicant an approved copy of the preliminary plan." (*Id.*)

The applicant must confer with the Department of Public Works and the Parish Health unit "to determine the standards and specifications, which shall govern proposed improvements." (UDC § 4.102(D), Doc. 73-2 at 10.) After approval of the preliminary plat by the Planning Commission, he must submit "complete construction plans for the first or initial development of the area given preliminary approval" along with other information to the Department of Public Works "for their review and approval." (*Id.*) No construction work can be done until the completed construction plans have been approved by the Department of Public Works, and "a reasonable time must be allocated for the proper study of the plans submitted." (*Id.*, Doc. 73-2 at 10—11.) Then, the applicant proceeds with preparation of a final plat. (*Id.*)

The UDC further provides:

> After construction plans have been approved by the Department of Public Works and sewer construction plans have been approved by the Department of Public Health and the Health Unit, the Secretary of the Planning Commission shall be notified of such approval in writing. Final approval of construction plans shall be valid for a period of six (6) months from date of approval. . .

(UDC § 4.102(F), Doc 73-2 at 11.) After a preconstruction meeting with the Department of Public Works, a permit is issued, and construction can begin. (UDC § 4.102(G), Doc 73-2 at 11.)

After construction is complete, the improvements are accepted and approved by the Department of Public Works and the Secretary of the Planning Commission. (UDC § 4.102(H), Doc. 73-2 at 13-14.) The final plat is then checked for conformity with the preliminary plans and Section 4.6 of the UDC (governing final plats), and it cannot be approved until there has

been compliance with all stipulations of the Planning Commission and Department of Public

Works.  (UDC § 4.102(I), Doc. 73-2 at 14.)  After approval, the final plat is filed to the Director

of the Planning Commission. (UDC § 4.102(J), Doc. 73-2 at 14.)

### 3. Preliminary Plats

Section 4.03 of the UDC specifically addresses preliminary plats.  This section provides:

> The purpose of the preliminary plat is to show graphically all facts needed to
> enable the Planning Commission, the Department of Public Works, and other
> City-Parish agencies, including the Parish School Board, Recreation and Park
> Commission, and the Parish Health Unit, to determine whether the proposed
> layout of the land in question meets the requirements of these regulations. The
> Department of Public Works also utilizes the preliminary plat to assign municipal
> address block ranges and address numbers to new streets and properties. Changes
> may be necessary in the preliminary plat before it can be tentatively approved.
> Approval of a preliminary plat is a tentative approval only and does not constitute
> the approval of a Final Plat.

(UDC § 4.03, Doc. 73-2 at 21.)  The preliminary plat normally includes the title under which the

proposed subdivision is to be recorded; boundary lines and existing improvements; designation

of lots; names of all abutting subdivisions; features of the proposed subdivision; sewers, water

lines, and storm water management; the location of all existing and proposed servitudes and

public utilities, streets, special use areas such as proposed parks, playgrounds, and churches; a

north point, scale, and date; a vicinity map; flood elevation data, all public servitudes and all

private servitudes intended for public use; a storm water management plan; and a drainage

impact study; and a water quality study. (*Id.*, Doc. 73-2 at 21-24.)

Additionally, UDC § 4.103 provides in part:

> No preliminary plat shall be approved unless the Department of Public Works
> determines that public facilities will be adequate to support and service the area of
> the proposed subdivision. Public facilities and services to be examined for
> adequacy will include roads and public transportation facilities, sewerage and
> water service, schools, police stations, fire houses, and health clinics.

(UDC § 4.103(A)(2), Doc 73-2, at 15.)  The UDC then has specific provisions concerning

drainage improvements. (UDC § 4.103(A)(2)(e), Doc 73-2, at 15—16.)  As one Planning

Commission member testified, the Department of Public Works makes recommendations to the

Planning Commission with respect to drainage, traffic, and sewer impact. (Doc. 73-5 at 3.)

### C.  The Plaintiffs' Preliminary Plat

On October 11, 2012, the Plaintiffs submitted a preliminary plat to the Planning

Commission for a proposed cluster subdivision to be developed on approximately 57.5 acres of

their larger 101.96 acre tract. (Doc. 62-2 at 2; Doc. 73-1 at 9; Doc. 73-10 at 2.)   This proposed

cluster subdivision was named Mallard Trails. (Doc. 62-2 at 2; Doc. 73-1 at 9.)

Plaintiffs have submitted evidence highlighting the ways in which the preliminary plat

complied with UDC and other requirements.  The property was zoned for rural, and the Mallard

Trails would have complied with those zoning requirements. (Doc. 73-4 at 18; Doc. 73-5 at 4, 7;

Doc. 73-6 at 6.)  Moreover, the Planning Commission staff recommended that Plaintiffs'

preliminary plat be approved and felt that it met all the requirements of the UDC. (Doc. 73-4 at

20, 41; Doc. 73-5 at 6; Doc. 73-7 at 19.)  The Department of Public Works recommended

approval, provided that its comments were addressed and written into the Planning Commission

approval; however, these items were not going to be done prior to the Planning Commission's

vote. (Doc. 73-5 at 6; Doc. 73-6 at 8.)  One Planning Commission member even admitted that

the project "exceeded all of the UDC requirements" and that there were no requirements that the

developers did not meet with respect to this preliminary subdivision plat. (Doc. 73-5 at 18—19.)

### D.  The Public Hearing

Pursuant to the UDC, the public hearing regarding the application for the Mallard Trails preliminary plat was placed on the agenda for the November 13, 2012, meeting of the Planning Commission. (Doc. 62-2 at 2; Doc. 73-1 at 9.)  The hearing was postponed several times.[2]

On January 22, 2013, a public hearing regarding the application for Mallard Trails' preliminary plat was held and attended by the Plaintiffs as well as members of the public. (Doc. 62-2 at 3; Doc. 73-1 at 2.)  The following commissioners attended the hearing: Tara Wicker, Darius Bonton, Sarah Holiday-James, Laurie Marien, Steven Perret, John Price, and Martha Tassin. (Doc. 62-2 at 3; Doc. 73-1 at 2.)

### 1. Individuals Speaking in Favor of Approving the Preliminary Plat

Several individuals spoke in favor of approving the preliminary plat application.  (Doc. 62-2 at 3—5; Doc. 73-1 at 10.)  Among other things, the Plaintiffs' engineer, G. Wayne Sledge, made the following statements:

- Fifty-five percent (55%) of the project will include common open space.

- Five (5) acres of wetlands were intended to be preserved.

- Two meetings were held with area residents on November 7, 2012, and November 28, 2012.

- Three (3) layouts of the subdivision were submitted to the Planning Commission staff, two of which were rejected because they did not meet the criteria for a cluster subdivision.

- A significant portion of the project lies in the 100-year flood plain.

---

[2] On November 9, 2012, the Plaintiffs' engineer, G. Wayne Sledge, requested that the application be deferred until the next scheduled meeting so that the Plaintiffs could meet with area residents. (Doc. 62-2 at 2; Doc. 73-1 at 9.) Pursuant to the UDC, the public hearing regarding the application for Mallard Trails' preliminary plat was placed on the agenda for the December 10, 2012, meeting of the Planning Commission. (Doc. 62-2 at 2—3; Doc. 73-1 at 9.) At the December 10, 2012, meeting, Commissioner W.T. Winfield moved that the consideration for the application for Mallard Trails' preliminary plat be deferred until the next scheduled meeting on January 22, 2013, which was seconded by Commissioner Darius Bonton. (Doc. 62-2 at 3; Doc. 73-1 at 9—10.)

- The property is really close to Bayou Manchac.

- Regarding the local issue of drainage, much of this property and the adjoining property drains poorly.

- Several meetings with the DEQ were conducted because there was a lot of concern about the impact of the discharge from the sewer treatment plant into the Bayou Manchac watershed.

- [T]he fundamental issue is it floods because [the property is] low, and showing you [the pipe sizes that will be laid under Hoo Shoo Too Road] is more feel good than substance because it's low, and there's nothing we're doing to change that.

(Doc. 62-2 at 3—4; Doc. 73-1 at 10.)

Plaintiff George Robinson also participated in the hearing and spoke in favor of approving the preliminary plat application. (Doc. 62-2 at 4; Doc. 73-1 at 10.)  While setting forth his reasons as to why the project should be approved, he stated the following:

He was assured by DPW and the Sheriff's Department that they will do additional surveillance out on Hoo Shoo Too Road and implement speed radar signs in an effort to get motorists to drive slower so the impact on fatalities and serious accidents are decreased.

(Doc. 62-2 at 4—5; Doc. 73-1 at 11.)

Vera Martin, a local resident, spoke in favor of the approval. (Doc. 62-2 at 5; Doc. 73-1 at 11.)  Martin stated that she "feel[s] that they should be able to go ahead with their property." (Doc. 62-2 at 5; Doc. 73-1 at 11.)

## 2. Individuals Speaking in Opposition to Approval

However, five other local residents spoke in opposition to the approval. (Doc. 62-2 at 5; Doc. 73-1 at 11.)  Fred Matthews lives on Hoo Shoo Too Road, and he expressed concerns about detrimental flooding, poor drainage, and dangerous traffic. (Doc. 62-2 at 5; Doc. 73-1 at 11.)

Brent Rhodes is a local real estate developer who developed the Mallard Lakes subdivision, which was across from Plaintiffs' proposed subdivision. (Doc. 62-2 at 5; Doc. 73-1

11

at 11.)  Rhodes opined that the Plaintiffs' proposed subdivision was a bad development and expressed concerns about poor drainage and dangerous traffic. (Doc. 62-2 at 5; Doc. 73-1 at 11.)

Pepper Allgood lives on Hoo Shoo Too Road. (Doc. 62-2 at 5; Doc. 73-1 at 11.)  He stated that approval should fail because no drainage impact study was provided with the submission of the preliminary plat in accordance with the UDC. (Doc. 62-2 at 5; Doc. 73-1 at 11.)  He also expressed concerns about poor drainage, detrimental flooding, fill mitigation (i.e. placing fill in the flood plain), questionable impervious coverage, the character of the project, and dangerous traffic. (Doc. 62-2 at 5; Doc. 73-1 at 11.)

The final two members of the public were Angel McCarstle and Jerry Chapman.  (Doc. 62-2 at 5; Doc. 73-1 at 11.)  Angel McCarstle, a local resident, expressed concerns about the low elevation, poor drainage, dangerous traffic, and a possible subdivision restriction that burdened the property. (Doc. 62-2 at 5—6; Doc. 73-1 at 11.)  Chapman, who lives on Hoo Shoo Too Road, expressed concerns about a possible subdivision restriction that burdened the property. (Doc. 62-2 at 6; Doc. 73-1 at 11.)

### 3. Technical Data or Expert Opinions

The Plaintiffs contend that there was no technical data or expert analysis presented adverse to the Plaintiffs' application.  The Plaintiff George Robinson attests to this fact. (Doc. 73-10 at 3.) Commissioners Price, Perret, and Marien appear to confirm this. (*See, infra*.) However, the Plaintiff's engineer appeared to make some statements (referenced above) that were in fact adverse.  This issue will be more fully explored below.

### 4.The Commissioners' Words and Actions

Four commissioners expressed the following concerns at the hearing: Commissioner Price, about fill mitigation/elevation and flooding; Commissioner Perret, about drainage and

flooding; Commissioner Tassin, about accessibility and traffic and about drainage and flooding; and Commissioner Marien, about connectivity. (Doc. 62-2 at 6; Doc. 73-1 at 11.)

After making a lengthy statement about the approval process, Commissioner Darius Bonton moved to approve the Plaintiffs' application; however, none of the other six (6) commissioners seconded his motion; therefore, it died for lack of a second. (Doc. 62-2 at 6; Doc. 73-1 at 12.)  Commissioner Price moved to defer the application, and this motion was seconded by Commissioner Bonton. (Doc. 62-2 at 6—7; Doc. 73-1 at 12.)   Commissioner Tassin moved to deny the application, and this motion was seconded by Commissioner Marien.  (Doc. 62-2 at 7; Doc. 73-1 at 12.)  Commissioner Price stated that the application "didn't look like it was going to be approved tonight, and rather than have it die today" allowed Plaintiffs an opportunity to alleviate the panel's concerns. (Doc. 62-2 at 7; Doc. 73-1 at 12.)  Thus, a vote on the preliminary plat was deferred for sixty (60) days on the motion of the commissioners. (Doc. 62-2 at 7; Doc. 73-1 at 2.)

### E.  Rejection of the Preliminary Plat

On April 22, 2013, the preliminary plat came back before the Planning Commission wherein the approval of the preliminary plat failed for lack of five affirmative votes. (Doc. 62-2 at 7; Doc. 73-1 at 3.)  Four planning commissioners voted in favor of approval. (Doc. 62-2 at 7; Doc. 73-1 at 3.)  Four planning commissioners voted against approval, and these included Laurie Marien, Steven Perret, John Price, and Martha Tassin. (Doc. 62-2 at 7; Doc. 73-1 at 3.)  One commissioner was absent. (Doc. 62-2 at 7; Doc. 73-1 at 3.)  The basis for the decision of those members who voted against approval will be addressed in more detail below.

### F.  After the Rejection: Plaintiffs' Conduct, Filing Suit, Damages, and a Second Preliminary Plat

The Defendants dispute the significance of certain issues related to the Plaintiffs' conduct after the denial of the preliminary plat but before suit was filed.  First, after the denial, the Plaintiffs did not submit any other proposed preliminary applications. (Doc. 62-2 at 7.)  Plaintiffs admit this is true but maintain it is irrelevant.  (Doc. 73-1 at 12.)

Second, the Defendants assert that Plaintiffs failed to seek judicial review pursuant to La. Rev. Stat. § 49:964 of Louisiana's Administrative Procedure Act, La. Rev. Stat. § 49:950 *et seq.* (Doc. 62-2 at 7.) The Plaintiffs argue that this is a legal conclusion and is irrelevant, for reasons discussed below. (Doc. 73-1 at 5.)

On May 7, 2013, Plaintiffs filed suit in state court against the Defendants, along with the four individual Planning Commission members. (Doc. 1-2 at 1.)  On June 12, 2013, the Defendants removed the action to this court. (Doc. 1.)

In the Petition, in addition to the other claims discussed above, the Plaintiffs sought a writ of mandamus requiring the Planning Commission to approve the preliminary plat. (Doc. 1-2 at 6—7.)  This Court denied the Plaintiffs' mandamus claim in its ruling on the Defendants' motion to dismiss. (Doc. 36 at 10—11.)

Additionally, after suit was filed and beginning in September 2013, in about eight separate transactions, the Plaintiffs sold a majority of the 57.5 acres that would have comprised Mallard Trails. (Doc. 62-2 at 8—10; 73-1 at 8—9.)  The Defendants submit evidence that the Plaintiffs received at least $1.2 million for these sales and that this was profit. (Doc. 62-2 at 8—10.)

The Plaintiffs do not dispute receiving that amount from selling portions of the 57.5 acres as vacant and undeveloped tracts, but they do dispute the interpretation and significance of these

14

amounts. (Doc. 73-1 at 7—8; Doc. 73-10 at 3.)  The Plaintiffs argue that the Defendants have submitted no evidence supporting the conclusion that the above amount was net profit (i.e., gross profit minus costs). (*Id.*)  The Plaintiffs also submit evidence that, had the project been allowed to proceed, they would have earned a net profit of about $1.3 million above and beyond the value of the vacant land – that is, net profit from the sale of residential lots. (Doc. 73-10 at 3; Doc 72-7 at 22.)

Lastly, the parties do not dispute that, in November 2013, the Plaintiffs submitted to the Planning Commission for approval a preliminary plat for a subdivision that contained part of the land encompassing the proposed Mallard Trails subdivision. (Doc. 62-2 at 8; Doc. 73-1 at 8.)  In January 2014, the Plaintiffs' preliminary plat for a subdivision received unanimous approval from the Planning Commission. (Doc. 62-2 at 8; Doc. 73-1 at 8.) The parties dispute the significance of this fact, and the Court will discuss it in more detail below.

### III.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . .  [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586—87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' "

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## IV.   Discussion

### A.  Substantive Due Process Claim

#### 1. The Parties' Arguments

##### a.   The Defendants' Memorandum in Support

The Defendants describe the Plaintiffs' allegations of a substantive due process violation as "unequivocally baseless."  (Doc. 62-1 at 13.)  The Defendants are specifically referring to the Plaintiffs' claim that the Planning Commission relied solely on public opposition in making their decision and that the Defendants' reasons for denying the preliminary plat were arbitrary and capricious and an unreasonable exercise of police power.

The Defendants argue that the rational relationship test should be applied and that, at the public hearing, the commissioners voting against the project "collectively expressed concerns about drainage, flooding, fill mitigation/elevation, traffic, emergency vehicle accessibility, and connectivity, which are all legitimate reasons that bear a substantial relationship to the public's health, safety, morals, and general welfare." (Doc. 62-1 at 14.)  The Defendants contend this is confirmed by the depositions of these commissioners.  Moreover, the Defendants assert that, "[d]uring his deposition, Plaintiff, Mr. Robinson, acknowledged that the Planning Commission raised legitimate concerns about his project" and that he "repeatedly conceded that the

16

Commissioners concerns were well placed." (Doc. 62-1 at 14.)  The Defendants conclude by stating that the reasons cited by the Defendants at the "public hearing bear no hint of arbitrary and capricious conduct," are in fact "substantially related to the general welfare of the community[,] and "undoubtedly provide a 'conceivable legitimate governmental objective that is at least debatable.' " (Doc. 62-1 at 15.)

### b.  The Plaintiffs' Opposition

The Plaintiffs first rely on this Court's holding on the Defendants' motion to dismiss (Doc. 36) and claim that, if the Planning Commission's decision were based solely on public opposition, such a decision would be arbitrary and capricious and thus offend substantive due process.  The Plaintiffs assert that one of the commissioners who voted to deny the project agreed:

> Q:     So if there were neighbors who said the traffic was too bad or there were drainage issues, would that be enough of a reason for you to vote no on this project[?]
>
> A:     No.  There would have to be some kind of substantiating evidence or something.  I mean, people get up there and say all kinds of stuff.

(Doc. 73 at 10 (quoting Doc. 73-6 at 16).)

The Plaintiffs contend that the Defendants cite only to "(1) statements made by the public at the hearing, and (2) the subjective 'concerns' expressed by the [Planning Commission] about flooding, drainage, and traffic in the vicinity of the Mallard Trails Project." (Doc. 73 at 10—11.)  The Plaintiffs argue that the testimony of the commissioners who voted to deny the project demonstrates that the only basis for their subjective beliefs was public opposition and that no technical or expert analysis or other objective data supported their decision.  Plaintiffs claim that these "concerns" did not stop the Defendants from approving of other subdivisions near the Mallard Trails project.

The Plaintiffs assert that, "Defendants' apparent contention is that superficially well-meaning concerns about legitimate issues, even if based upon nothing more than personal opinion and public opposition and even though not applied consistently to all projects considered by Defendants, is enough to justify Defendants' action." (Doc. 73 at 11.)  Again relying on the Court's previous ruling, the Plaintiffs contend that the Planning Commission must base its decision on "data presented to" it and that "such 'data' cannot consist solely of public opposition." (*Id.*)  The Plaintiffs claim that the only "data" presented by the Defendants is "statements of lay opponents of the Mallard Trails Project." (*Id.*)  The Plaintiffs assert that a reasonable juror could find in their favor on this claim.

### c.  The Defendants' Reply

The Defendants dispute the Plaintiffs' contention that the Planning Commission needed to rely on "technical or expert analysis or other objective data" in making its decision, and the Defendants dispute the Plaintiffs' interpretation of the cited case law.

Rather, the key question is "whether a rational relationship exists between the [policy] and a conceivable legitimate governmental objective.  If the question is at least debatable, there is no substantive due process" violation. (Doc. 76 at 6 (citing *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 175 (5th Cir. 1996)).)  The Defendants argue that the Planning Commission need not consider expert analysis or technical data but must rather, under state and federal law, act with purpose of "promot[ing] the health, safety, morals, or the general welfare of the community." (*Id.* (citing La. Rev. Stat. § 33:107; *FM Properties*, 93 F.3d at 174—75).)

The Defendants further contend that "data" need not be defined to mean only scientific or technical information, and, in any event, the Planning Commission considered the following "data": "The public's opposition, the recommendations from the Planning Commission staff,

their personal visits to the site of the proposed project, their in-person meetings with the property

owners, their requests for further studies to be conducted and, their request for a secondary

access road for emergency vehicle access." (Doc. 76 at 6 (citing Doc. 62-10).)  Defendants thus

maintain that they did not rely on public opposition alone but rather a "plethora of legitimate

reasons." (*Id.* at 6 n. 9.)

The Defendants finally say that the approval of other subdivisions is irrelevant; there is

no information provided as to the similarities of those approved subdivisions.

### d.  The Plaintiffs' Surreply

The Plaintiffs respond by attacking the list of "data" considered by the Defendants.  The

Plaintiffs claim that "the only evidence [the Defendants] cite in support of these various 'factors'

is Exhibit 'H' to their motion, the minutes of the January 2013 meeting in which action on the

project was deferred, and these minutes reflect only 'public opposition' to the development."

(Doc. 80 at 4.)  Thus, according to the Plaintiffs, "these new 'factors' are unsubstantiated by the

record and cannot comprise a basis for summary judgment." (*Id.*)

The Plaintiffs also argue that the record evidence concerning these factors "actually

supports Plaintiffs' case." (Doc. 80 at 4 n. 4.)  For instance, the Plaintiffs note that the

"Defendants neglect to mention that the Planning Commission's 'request for a secondary access

road for emergency vehicle access' was granted by Plaintiffs, who amended their preliminary

plat to include the requested access road after the January 2013 meeting." (*Id.* (citing Doc. 73-4

at 21).)  Further, the Defendants "neglect to mention" that the Planning Commission staff

recommended that the project be approved. (Doc. 80 at 4 n. 4 (citing Doc. 73 at 2 n. 5).)

Nevertheless, the Defendants' denied Plaintiffs' preliminary plat application in April of 2013.

## 2. The Standard for Substantive Due Process Claims

The first issue that must be addressed is the appropriate standard.  The Fifth Circuit has

explained:

> When we review a substantive due process claim, we pursue "either of two
> analytical tracks. A regulatory decision can be legislative or it can be adjudicative,
> and it will be reviewed differently depending on which category it is placed into."
> *Shelton v. City of College Station,* 780 F.2d 475, 479 (5th Cir. 1986); *see also*
> *Vulcan Materials Co. v. City of Tehuacana,* 238 F.3d 382, 388 (5th Cir. 2001)
> (citing *Shelton,* 780 F.2d at 479–84). Under the adjudicative model, "actions by
> state officials are tested by historical facts and 'adequate evidence found within a
> defined record.' " *Mahone v. Addicks Util. Dist. of Harris Cnty.,* 836 F.2d 921,
> 934 (5th Cir. 1988) (citing *Shelton,* 780 F.2d at 479). As such, a court "using the
> adjudicative model must focus on what actually motivated the conduct." *Id.* In
> contrast, if the action is evaluated under the legislative model, the court asks only
> whether there was "a conceivable factual basis for the specific decision made?"
> *Shelton,* 780 F.2d at 479. "In practical terms, therefore, evidence that an official
> was motivated by an illegitimate purpose when he took an action cannot, under
> the legislative model, invalidate the official's action. Instead, if a court is able to
> hypothesize a legitimate purpose to support the action, the action must be treated
> as valid." *Mahone,* 836 F.2d at 934.

*Bush v. City of Gulfport, Miss.*, 454 F. App'x 270, 276 (5th Cir. 2011). Thus, the correct standard

turns on whether the Planning Commission's decision about a preliminary plat is legislative or

adjudicative.

The Court finds that it is adjudicative.  In *Homeowner/Contractor Consultants, Inc. v.*

*Ascension Parish Planning and Zonning Commission,* 32 F. Supp. 2d 384 (M.D. La. 1999), this

Court directly addressed the present question in the context of whether to grant individual

commissioners absolute immunity.  After reviewing case law from the Supreme Court and First

Circuit, the Court cited the test articulated in *Hughes v. Tarrant County Texas*, 948 F.2d 918 (5th

Cir. 1991), which stated:

> The first test focuses on the nature of the facts used to reach the given decision. If
> the underlying facts on which the decision is based are "legislative facts," such as
> the "generalizations concerning a policy or state of affairs," then the decision is

20

legislative. If the facts used in the decisionmaking are more specific, such as those that relate to particular individuals or situations, then the decision is administrative. The second test focuses on the "particularity of the impact of the state action." If the action involves establishment of a general policy, it is legislative; if the action "single[s] out specifiable individuals and affect[s] them differently from others," it is administrative. [*Cutting v. Muzzey,* 724 F.2d 259, 261 (1st Cir. 1984) (citation omitted).]

*Homeowner/Contractor*, 32 F. Supp. 2d at 389 (citing *Hughes*, 948 F.2d at 920).  Applying this test, the *Homeowner/Contractor* court concluded:

[T]he decision by the Planning Commission not to approve the preliminary plat was not one with broad policy implications. The facts used in the decisionmaking were specific and related only to the plaintiff. The Planning Commission's action involved enforcement of existing regulations and did not establish general policy. Thus, the Court finds that the decision by the members of the Planning Commission to deny approval of the plaintiff's preliminary plat for the proposed subdivision development was administrative in nature.

*Id.*  While the *Homeowner/Contractor* court used the term "administrative" in its immunity analysis, it later used this term synonymously with "adjudicative" in its due process analysis. *Id.* at 391.  Thus, this Court has already determined that the Planning Commission's decision to deny preliminary plat approval is adjudicative, and the Court does not disagree with that conclusion.[3]

Accordingly, the Court will apply the standard for adjudicative decisions.  "The adjudicative mode of analysis asks not whether there was some conceivable rational basis for the challenged decision, but requires a finding as to what actually motivated the decision, and then asks whether this is rationally related to a legitimate governmental purpose." *Vineyard Inv., LLC v. City of Madison, Miss.*, 757 F. Supp. 2d 607, 617 (S.D. Miss. 2010), *aff'd sub nom. Vineyard Inv., L.L.C. v. The City Of Madison*, *Miss.*, 440 F. App'x 310 (5th Cir. 2011).  After the actual

---

[3] This Court also rejected an argument potentially relevant here; Louisiana Revised Statutes 33:101.1, which "provides that the act of approving or disapproving a subdivision plat is declared a legislative function involving the exercise of legislative discretion by a planning commission[,]" does not trump "Fifth Circuit jurisprudence[, which] is dispositive[.]"  *Homeowner/Contractor*, 32 F. Supp. 2d at 390 n. 35.

interest is identified, the Court applies "traditional rational basis review to the action." *Vineyard Inv., L.L.C.*, 440 F. App'x at 314. The Court first determines whether the Defendants' interest is considered a legitimate governmental interest. *Vineyard Investments, L.L.C.*, 440 F. App'x at 314. The Court then examines whether the Government action advanced its legitimate goal. *Id.* As long as "the existence of a rational relationship" between the government action and the goal "is at least debatable," there is no constitutional violation. *Id.* (quoting *FM Props.*, 93 F.3d at 175.)

### 3. The Evidence Presented

The Court now turns to the evidence presented by the parties to determine the true purpose of the Government's action. As stated above, at the January 22, 2013, public hearing, four commissioners expressed the following concerns: Commissioner Price, about fill mitigation/elevation and flooding; Commissioner Perret, about drainage and flooding; Commissioner Tassin, about accessibility and traffic and about drainage and flooding; and Commissioner Marien, about connectivity. (Doc. 62-2 at 6; Doc. 73-1 at 11.)

At his deposition, Price testified at length about the basis for his denying the project. Price stated that he voted against the project because he "listened and heard the people who lived on Hoo Shoo Too come forth and present direct evidence of the flooding and drainage issues that they had experienced" there. (Doc. 73-4 at 22.) Price stated that he "lived in Baton Rouge for 40 years, so [he has] personal knowledge of Hoo Shoo Too Road. [He has] been out there at times when it's not flooded. [He's] been out there when [he] couldn't get all the way down to the end of the road because it flooded." (*Id.*) Price also said he heard information from other developments brought before the Planning Commission involving Hoo Shoo Too Road. (*Id.*) He

was present at those other meetings and listened to arguments involving traffic and the danger of traffic accidents and water-back up. (*Id.* at 23.)

Price further stated that the "drainage issues that [Plaintiffs'] engineers proposed -- and I'm not an engineer -- sounded kind of corky to [him]." (*Id.* at 24.)  He referenced pictures being passed around at the hearing that "basically showed a sea, and [he] had grave concerns about what another development out there would do with regard to drainage." (*Id.*)  Price also said he was concerned about the fact that there were wetlands on the Plaintiffs' property. (*Id.*)  Price stated that his "personal knowledge of draining out there, drainage out there, and experience led [him] to question the impact study that had been presented by [Plaintiffs] with regard to how they would handle drainage[.]" (*Id.* at 25.)  He listened to what was presented at the hearing and "saw evidence of flooding."  (*Id.*)  He admitted that he could not recall seeing evidence of technical data contradicting the drainage impact study provided by the Plaintiffs. (*Id.* at 25—26.)

Price reviewed one traffic study done by the Department of Public Works, but it was done in connection with Hoo Shoo Too Road and not specifically for Mallard Trails. (*Id.* at 31.) He also heard arguments about an access road. (*Id.*)

Price stated that he visited the Plaintiffs' property; first he said there was nothing about that visit that factored into his denial, but he later stated that he based his denial on "the fact of where it was located on Hoo Shoo Too Road, the topography of the land[,] [and] . . . its relative closeness to Bayou Manchac." (*Id.* at 39.)

Price also testified about materials that are provided to the commissioners in connection with his consideration of a preliminary subdivision plat.  Specifically, the commissioners received:

> [T]he application that's submitted by the developer to the Planning Commission staff, and they work through all of their stuff.  And then they either offer us an

> opinion that says, we've received approval from DPW traffic or TPW sewer or
> DPW drainage or whatever it is, and I would assume we probable have access to
> those individual documents if we so choose to look at them and see what has been
> submitted.

(Doc. 73-4 at 9—10.)  That is, the commissioners get a "homework packet," which is "basically

the application that's submitted, and what [the commissioners] are going to look at in connection

with that." (*Id.* at 9—10.)  The commissioners have access to any other documents if they choose

to pursue them with the staff.  (*Id.*)

     If the commissioners have questions on issues, they "have the ability as a Planning

Commission member, to go back and ask the Planning Commission staff for additional

information." (*Id.* at 14.)  The staff in turn has other agencies like the Department of Public

Works to address the issues. (*Id.* at 14—15.)  Here, the staff recommended approval. (*Id.* at 21.)

     Price may have also spoken to individuals at the Department of Public Works with

various questions. (*Id.* at 17.)  Price did not recall speaking with anyone at the city. (*Id.* at 37—

40.)

     Price also testified that the Plaintiffs provided a drainage impact study that he reviewed

and that concluded that the Mallard Trails development "would have a minimal adverse impact

on drainage in this area based on the analysis requirements, Unified Development Code, and

Department of Public Works and is acceptable as proposed." (Doc. 73-4 at 26—27.)  He did not

recall whether he received any drainage impact studies or engineering report that opposed that

study or conflicted with it. (*Id.* at 27—28.)

     Perret also testified at his deposition about why he voted against the project.  When asked

directly, Perret stated:

> In review of information that was provided, as well as testimony that had to be
> done with traffic and flooding and, in particular, my concern had to do with the
> building up of the elevations for the subdivision roads and the road that goes

across the wetlands that was built up from elevations, if I remember, 11 to 13 feet all the way up to 21 to 22 feet in an area that was low and had flooding issues.

(Doc. 73-5 at 8.)  Perret testified that he was provided with one document in particular that was "a site plan that showed elevations and the proposed development." (*Id.* at 8—9.)  Perret said this document concerned in that "in the elevations that were -- was a very -- was a low elevation of 10, 11, 12 feet coming in, building up to the elevation of 21 feet across a wetland and low areas where flooding occurs." (*Id.* at 9.)  Perret admitted that he was not presented with "any technical information related to this elevation issue that supported [his] concern about the flooding issue[.]" (*Id.* at 10; *see id.* at 11.)  Perrett said this issue was based on his "review of the project that was being presented to the Planning Commission and for [him] to consider." (*Id.*)  He stated he had no "background in dealing with these types of issues[.]" (*Id.*)

Ultimately, Perret's primary reasons for voting against the project were flooding and drainage. (*Id.* at 11.)  However, he did state that there was "significant public opposition to this particular project." (*Id.* at 17.)

Perrett also testified about the Enhanced Drainage Impact Study. (*Id.* at 15.) The conclusion of that document was that "this development will have minimal adverse impact on drainage in this area based on the analysis requirements of the [UDC] and Department of Public Works, and is acceptable as proposed." (*Id.* at 15—16.)  Perret, like Price, did not recall being provided with any reports or technical information that contradicted the findings of that report. (*Id.* at 16.)

Perret discussed the elevations at the Planning Commission public hearings, and he had a conversation with Shannon Dupont "to kind of help [him] understand the map better and the . . . document." (*Id.* at 9.)  Dupont is with the Department of Public Works. (*Id.*)  Perret acknowledged that the Department of Public Works recommended approval of the project. (*Id.* at

25

10.) Perret discussed with Dupont "the plat, . . . the elevations, . . . [and] drainage issues from surrounding properties that drain onto this property[.]" (*Id.* at 10.)

Perret also testified:

Q:      There's Mallard Roost Avenue.  And what change would have needed to occur with respect to that?

A:      It's my opinion, as I reviewed it, that this being built up to 21-foot, when all these other elevations are 10, 12, 11, I had a concern of this that there would be flooding because of this road now blocking water coming out, draining to Manchac.

Q:      And that's just based on your just general knowledge –

A:      General –

Q:      -- of drainage and elevation issues?

A:      Just reviewing this document and applying the knowledge that I have to it, and what I believe that a concern would have been – that I would have with this layout, and based off the information that I heard in the meeting.

(*Id.* at 18.)

Laurie Marien testified at her deposition about her reasons for rejecting the project.  She stated that she did not speak to anyone who was not present at the meeting about the traffic issues that came up in connection with the project. (Doc. 73-6 at 10.)  She also did not recall speaking to anyone prior to the meeting about the project, and she did not recall any representative of the City presenting any engineering or technical information related to the project. (*Id.* at 11.)  She also did not recall whether she received the Enhanced Drainage Impact Study or whether it was something she considered. (*Id.* at 12.)  She did recall there being "some" public opposing from neighboring landowners." (*Id.*)  She said she did not recall the "details of this application, just the general stuff." (*Id.* at 14.)  She could not specifically answer why she voted no to the project:

26

Q:     As we sit here today, can you tell me why you voted no on this project?

A:     I can't tell you exactly why I voted no.  It's been two years.  I'm sure that it had to do with the overarching [sic]; like I said, the health, safety and welfare of the neighbors, and there were some issues.  Like I said, I know there had been a major flooding event earlier in that year of '13, and that was a big concern.  And the traffic was a big concern, but I can't tell you exactly why I voted how I did."

(*Id.* at 73-6 at 14—15.)  She also did not recall receiving any documents or any specific technical information related to traffic regarding this project; she may have, but she did not remember receiving specific documents. (*Id.* at 26.)  She did recall a "major flooding incident" that was "all over the parish," but it was not specific to that area. (*Id.* at 27.)

While Marien did not know of the reason why she voted no, she did state that a reason was needed:

Q:     Do you believe you had the discretion to vote no if the developer met all of the requirements of the UDC?

A:     No.  There would have to be a reason why.  You can't just vote no.  If somebody meets all of the requirements, there would have to be a reason why you would vote no.  I wouldn't vote no just because I didn't like it, or they were going to build, you know, small homes and neighbors wanted big fancy million dollar homes.  That's not a reason to vote against it.  It has to be one of those major categories.

Q:     When you say "major categories," you're referring to traffic, drainage –

A:     Well, just like I said, the health, safety, and welfare.  Was that – would that subdivision negatively impact in one of those ways, the neighbors.  It wouldn't just be a technical issue.

Q:     So if there were neighbors who said the traffic was too bad or there were drainage issues, would that be enough of a reason for you to vote no on this project[?]

A:     No.  There would have to be some kind of substantiating evidence or something.  I mean, people get up there and say all kinds of stuff.

(Doc. 73-6 at 15—16.)

27

Lastly, Price admitted that the Planning Commission voted to approve other subdivisions in that same area since the Plaintiffs' project. (Doc. 73-4 at 40.)  Perret testified to the same. (Doc. 73-5 at 13—14.)

### 4. Analysis

To reiterate, "[t]he adjudicative mode of analysis asks not whether there was some conceivable rational basis for the challenged decision, but requires a finding as to what actually motivated the decision, and then asks whether this is rationally related to a legitimate governmental purpose." *Vineyard Inv., LLC*, 757 F. Supp. 2d at 617.  After the actual interest is identified, the Court applies "traditional rational basis review to the action." *Vineyard Inv., L.L.C.*, 440 F. App'x at 314.  The Court first determines whether the Defendants' interest is considered a legitimate governmental interest.  *Vineyard Investments, L.L.C.*, 440 F. App'x at 314.  The Court then examines whether the Government action advanced its legitimate goal. *Id.* As long as "the existence of a rational relationship" between the government action and the goal "is at least debatable," there is no constitutional violation. *Id.* (quoting *FM Props.*, 93 F.3d at 175.)

Having carefully considered the law and the evidence in the record, the Court finds that summary judgment is appropriate on this claim.  In short, no reasonable juror would conclude that the Planning Commission lacked a legitimate reason.  That is, all reasonable jurors would conclude that the reasons for the denial of the preliminary plat were the commissioners' concerns about issues like fill mitigation/elevation, flooding, and drainage.  It is undisputed that these were the issues specifically mentioned at the public hearing by the commissioners who voted against the project.  Moreover, Price testified at his deposition that he based his decision on, among other things, the fact that he has seen flooding on Hoo Shoo Too Road, his opinion that

28

the Plaintiffs' engineer's discussion of drainage issues sounded "corky" to him, and the project's proximity to Bayou Manchac. Similarly, Perret testified that he based his decision on concerns about the elevation of the project, which in part were based on a particular document. Perret also said that he based his decision in part on testimony at the hearing, and it is uncontested that the Plaintiffs' engineer said at that hearing (1) that a significant portion of the project lies in the 100-year flood plain and that the property was really close to Bayou Manchac, and (2) much of the property and the adjoining property drains poorly. On top of all of this were the concerns expressed by the public about these very issues. Having found that the reasons for the denial were issues like fill mitigation/elevation, flooding, and drainage, the Court further finds that, as a matter of law, these reasons were rationally related to legitimate governmental interests like public health, safety, and the general welfare.

The Plaintiffs argue that the decision was arbitrary and capricious because they were based solely on (1) public opposition and (2) subject concerns unsupported by technical evidence. But the lack of technical or expert information does not automatically mean the commissioners lacked legitimate concerns. Moreover, under the Plaintiffs' logic, there would be a substantive due process violation every time the Planning Commission acted without technical or expert evidence or chose to reject an applicant's expert. This is unsupported by the case law. *See FM Props.,* 93 F.3d at 174 (" '[t]he power to decide, to be wrong as well as right on contestable issues, is both privilege and curse of democracy.' Ergo, 'the due process clause does not require a state to implement its own law correctly[, nor does] [t]he Constitution . . . insist that a local government be right.' " (citations omitted)).

The Plaintiffs are correct that, in *Christopher Estates, Inc. v. East Baton Rouge Parish*, 413 So. 2d 1336 (La. App. 1 Cir. 1982), the Court found an arbitrary and capricious denial of a

29

plat in part on the fact that, as in the instant action, "no expert testimony was elicited at the hearing as to whether the proposed plat would adversely affect the health, safety, or general welfare of the public." *Id.* at 1340.  But this case also notes that "there was no evidence during the public hearing presented to the commission that the proposed plat was unacceptable for reasons relating to health or safety of the public." *Id.*

Here, unlike *Christopher Estates, Inc.*, the decision was based in part on evidence at the hearing related to public health and safety.   The above commissioners based their decisions in part on (1) the fact that the commissioners disbelieved the testimony about drainage given by the Plaintiffs' engineer at the public hearing, (2) pictures of flooding in the area presented at the hearing, and (3) concerns about elevation which were gleamed from a particular document furnished for the hearing.  This does not even take into account the information gleaned from other hearings, which is still "data presented" to the Planning Commission.

The Plaintiffs are also correct that they have presented evidence of other developments being approved in the area.  But the Defendants are correct that there is minimal evidence of the similarities of these developments to the Plaintiffs' project.  Without more, the Plaintiffs cannot create an issue of fact, even drawing inferences in their favor.

Accordingly, the Court grants the Defendants' motion for summary judgment on this issue.  The Plaintiffs' substantive due process claim is dismissed.

### B.  Procedural Due Process Claim

#### 1. The Parties' Arguments

##### a.  The Defendants' Memorandum in Support

As this Court previously explained, a procedural due process claim requires that the Plaintiff "identify a life, liberty, or property interest protected by the Fourth Amendment." (Doc.

36 at 22 (quoting *Blackburn v. City of Marshall*, 42 F.3d 925, 935 (5th Cir. 1995)).).  The

Plaintiff must then "identify a state action that resulted in a deprivation of that interest." (*Id.*

(quoting *Blackburn*, 42 F.3d at 935).)

Here, the Defendants attack the first requirement.  The Defendants argue that the

Plaintiffs must first show a " 'legitimate claim of entitlement' to the issuance of a license or

certificate (or in this case, approval of a preliminary plat)." (Doc. 62-1 at 15 (citing *Yale Auto*

*Parts, Inc. v. Johnson*, 758 F.2d 54, 58 (2d Cir. 1985)).)  The Defendants maintain that this

question depends on "whether, absent the alleged denial of due process, there is either a certainty

or a very strong likelihood that the application would have been granted." (Doc. 62-1 at 16.)

The Defendants assert that "compliance with the objective requirements of the UDC are

pre-conditions which must be met before a development can be considered for site plan approval,

and do not, as Plaintiffs argue, entitle the developer to said approval." (*Id.*)  The Defendants

argue that the Planning Commission must ensure that developments comply with "the general

public interest" and do not "create undue congestion of streets and traffic access or overcrowding

of land or overburden on public facilities such as transportation, sewage, drainage, schools,

parks, and other public facilities." (*Id.*)  The Plaintiffs' compliance with the regulations merely

gave them a subjective expectancy, and the decision ultimately rested on the Planning

Commission's "exercise of judgment." (*Id.*)

The Plaintiffs were also not entitled to approval merely because the Planning

Commission staff recommended approval; the regulations do not require the Planning

Commission to follow this recommendation.

The Defendants conclude by stating:

Plaintiffs' allegation that their preliminary plat was denied consideration by a
public body that will apply the objective criterion and standards for subdivision

31

approval pursuant to the provisions of the UDC is absurd. . . . The evidence
presented by Defendants in connection with this Motion is replete with legitimate,
unbiased, and sound reasoning that more than fulfilled the stated objectives for
subdivision approval.

(Doc. 62-1 at 17.)

### b.  The Plaintiffs' Opposition

The Plaintiffs only briefly respond to the Defendants' argument on this issue.  They state

that Defendants contend there is no "legitimate claim of entitlement" to approval "because such a

'claim of entitlement' requires 'either a certainty or a strong likelihood that the application could

have been granted.'"  (Doc. 73 at 12.)  The Plaintiffs then state, "Even though it is undisputed

that all requirements imposed by law on Plaintiffs were met, Defendants assert that Louisiana

law does not establish such a 'strong likelihood' that the application could have been granted."

(*Id.*)  The Plaintiffs then quote the Court's prior ruling on the Defendants' motion to dismiss:

> Plaintiffs have stated that they complied with all laws, and conformed to
> additional demands from Defendants.  Assuming this is true, and considering
> Louisiana's policy that land-use in these cases are presumptively valid, ***there was
> at least a "very strong likelihood" that Plaintiffs' application would be
> approved.***  Therefore, Plaintiffs had a legitimate claim to entitlement to approval
> of their preliminary plat, regardless of Defendants' discretion to grant or deny
> preliminary plat approval.

(Doc. 73 at 12 (quoting Doc. 36 at 25 (citations omitted) (emphasis added).)

### c.  The Defendants' Reply

The Defendants respond that "Plaintiffs did not have a 'legitimate claim of entitlement'

to preliminary plat approval because La. R.S. 33:101.1 provides Defendants with **discretion**

when approving or disapproving a subdivision plat." (Doc. 76 at 7 (emphasis in original).)

Relying on a federal Fourth Circuit case, the Defendants assert that property owners have a

legitimate claim of entitlement to approval if "the local agency lacks *all* discretion to deny

issuance of the permit or to withhold its approval." (*Id.* (citing *Scott v. Greenville Cty.*, 716 F.2d 1409, 1418—21 (4th Cir. 1983) (emphasis added)).)   Here, the Defendants had to submit their application to discretionary review by the Planning Commission, and this "vitiates their claim to entitlement." (Doc. 76 at 7—8.)   According to the Defendants, the Plaintiffs were not entitled to preliminary plat approval solely because they met all requirements and obtained a positive recommendation from the Planning Commission staff.   The Defendants cite to a Second Circuit case purportedly holding that, "when a local regulator's discretionary decision to deny an application is not arbitrary or capricious, the plaintiff will usually be deemed not to have a sufficient entitlement to constitute a protected property interest." (Doc. 76 at 8 n. 12 (citing *RRI Realty Corp. v. Inc. Vill. Of Southampton*, 870 F.2d 911 (2d 1989)).)

The Defendants note that the cases relied upon in the Court's earlier ruling on the motion to dismiss are state law cases that "do not establish the 'protected property interested created under state or local law' as contemplated by federal jurisprudence and do not employ the same standard as what has been established under federal law." (*Id.* at 7 n. 11.)   The Defendants argue that the "state cases reviewed the property owner's alleged deprivation based on a 'use by right' and used a strict scrutiny standard. " (*Id.*)   The Defendants claim this standard is not used in federal due process cases. (*Id.* (citing *Urban Hous. of Am., Inc. La. v. City of Shreveport*, No. 09-0317, 2013 WL 587900, at n. 6 (W.D. La. Feb. 13, 2013).

Lastly, Defendants maintain that, even if they did have a legitimate claim to entitlement, they suffered no deprivation of that interest.   According to the Defendants, the Plaintiffs received all the process that was due; they had a hearing, an opportunity to present evidence, and a fair and impartial consideration of their application.

#### d. The Plaintiffs' Surreply

The Plaintiffs' surreply states that the Defendants' reply is nothing more than a motion to reconsider the Court's prior ruling on the motion to dismiss. The Plaintiffs argue that the Defendants do not satisfy the legal grounds for a motion to reconsider. The Plaintiffs assert that the "Court should decline to reconsider its prior well-considered ruling and reject the new arguments which rely upon such reconsideration." (Doc. 80 at 2.)

### 2. Analysis

Again, "[i]n a section 1983 cause of action asserting a due process violation, a plaintiff must first identify a life, liberty, or property interest protected by the Fourteenth Amendment and then identify a state action that resulted in a deprivation of that interest." *Blackburn*, 42 F.3d at 935. The Fifth Circuit has explained:

> In order for a person to have a property interest within the ambit of the Fourteenth Amendment, he "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972). Property interests are not created by the Constitution; rather, they stem from independent sources such as state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings. [*Perry v. Sindermann*, 408 U.S. 593, 599-601, 92 S. Ct. 2694, 2699-2700, 33 L. Ed. 2d 570 (1972)]. However, it is clear that "the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood*, 426 U.S. 341, 344, 96 S. Ct. 2074, 2077, 48 L. Ed. 2d 684 (1976) (footnote omitted).

*Id.* at 936-37 (citation omitted).

Furthermore, "[a]lthough the underlying substantive interest is created by 'an independent source such as state law,' *federal constitutional law* determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 757, 125 S. Ct. 2796, 2803—04, 162 L. Ed. 2d 658 (2005) (emphasis in original). The Supreme Court has recognized that "a benefit is

34

not a protected entitlement if government officials may grant or deny it in their discretion." *Id.*, 545 U.S. at 756, 125 S. Ct. at 2803.

Louisiana Revised Statutes § 33:101.1 provides in pertinent part:

*Except as otherwise provided in this Subpart*, the act of approving or disapproving a subdivision plat is hereby declared a legislative function involving the *exercise of legislative discretion by the planning commission*; *based upon data presented to it*; provided that any subdivision ordinance enacted by the governing authority of a parish or municipality or the acts of the planning commission, or planning administrator *shall be subject to judicial review on the grounds of abuse of discretion, unreasonable exercise of police powers, an excessive use of the power herein granted, or denial of the right of due process*.

(emphasis added).  Thus, as the Court recognized in its earlier ruling on the Defendants' motion to dismiss, the Planning Commission has discretion, but it is limited in that it must be "based upon data presented to it" and it must, among other things, comport with due process.

In *Homeowner/Contractor Consultants*, this Court cited with approval the standard announced in *Yale Auto Parts v. Johnson*, 758 F.2d 54, 59 (2d Cir. 1985) regarding the property interest in issuances of licenses and certificates by local land regulators. 32 F. Supp. 2d at 391—92. Under that standard, in order to have a legitimate claim of entitlement to the issuance of a license or certificate, there must have been "either a certainty or a very strong likelihood that the application would have been granted." *Id.* (citation omitted).  The *Homeowner/Contractor* court also recognized:

 If federal courts are not to become zoning boards of appeals . . . the entitlement test of *Yale Auto Parts*—"certainty or a very strong likelihood" of issuance—must be applied with considerable rigor. Application of the test must focus primarily on the degree of discretion enjoyed by the issuing authority, not the estimated probability that the authority will act favorably in a particular case . . .  The "strong likelihood" aspect of *Yale Auto Parts* comes into play only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured; an entitlement does not arise simply because it is likely that broad discretion will be favorably exercised.

35

32 F. Supp. 2d 392 (quoting *RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 918

(2d Cir. 1989)).  The *Homeowner/Contractor Consultants* further explained:

> A claim of entitlement arises, for these purposes, when a statute or regulation
> places substantial limits on the government's exercise of its licensing discretion.
> Thus, the holder of a land use permit has a property interest if a state law or
> regulation limits the issuing authority's discretion to restrict or revoke the permit
> by requiring that the permit issue upon compliance with terms and conditions
> prescribed by statute or ordinance.

*Id.* (quoting *Bituminous Materials v. Rice County*, 126 F.3d 1068, 1070 (8th Cir.1997).

Thus, the central question here is whether, under state law, the Planning Commission did

in fact have discretion to deny the preliminary plat; that is, was the Planning Commission's

"discretion . . . so narrowly circumstanced that approval" was a "certainty," a "very strong

likelihood," or "virtually assured"?  The Plaintiffs argue that this was decided in the earlier

ruling on the motion to dismiss, and the Defendants urge that it was not and that, to the extent it

was, the earlier ruling was incorrect.

Having carefully considered the law and facts in the record, the Court finds that its earlier

ruling does not control the outcome of this ruling.  That is, despite the Court's decision on the

Defendants' motion to dismiss, the Defendants are still entitled to summary judgment here.

In its earlier ruling on the motion to dismiss, the Court found:

> Louisiana recognizes that when a landowner complies with all applicable
> zoning and conforms to every modification imposed, the landowner's landuse is
> presumptively valid and certificates and licenses should be approved. *See*
> *D'Argent Properties LLC v. City of Shreveport*, 44,457 (La. App. 2 Cir. 6/24/09),
> 15 So.3d 334,  340, *writ denied,* 2009-1726 (La. 11/6/09), 21 So.3d 308; *See also*
> *Urban Housing of America, Inc. v. City of Shreveport*, 44,874 (La. App. 2 Cir.
> 10/28/09), 26 So. 3d 226, 231-32, *writ denied,* 2010-0026 (La. 4/23/10), 34 So.3d
> 269.
>
> Plaintiffs have stated that they complied with all laws, and conformed to
> additional demands from Defendants. (R.Doc. 1-2, ¶ 10-11). Assuming this is true,
> and considering Louisiana's policy that land-use in these cases are presumptively
> valid, there was at least a "very strong likelihood" that Plaintiffs' application

would be approved. Therefore, Plaintiffs had a legitimate claim to entitlement to approval of their preliminary plat, regardless of Defendants' discretion to grant or deny preliminary plat approval.

(Doc. 36 at 25.)  In essence, the parties dispute in their motion whether the rule from *D'Argent* and *Urban Housing* controls.

The Court finds that this question must be determined in light of *GBT Realty Corp. v. City of Shreveport*, 50,104 (La. App. 2 Cir. 9/30/15), 180 So. 3d 458 *writ denied*, 2015-2002 (La. 1/8/16); 184 So. 3d 693, which is a case rendered by the Louisiana Second Circuit after *D'Argent* and *Urban Housing* and after this Court rendered its earlier ruling on the motion to dismiss. *GBT Realty* provides guidance in how to interpret *D'Argent* and *Urban Housing*.  *GBT Realty* also demonstrates how the Planning Commission had discretion to act in this case, thereby defeating the Plaintiffs' due process claim.

Before turning to *GBT Realty*, the Court will summarize *Urban Housing*, which contains a discussion of *D'Argent*.  In *Urban Housing*, the plaintiff appealed the action of the city council in denying approval of a subdivision plan.  *Id.*, 26 So. 3d at 227.  The plaintiff developer consulted with the planning commission officials, incorporated all their suggested into the plan, and complied with all zoning and use ordinances. *Id.* at 228.  The plan was approved by the planning commission, but the city council later overturned the decision. *Id.*

At trial, "[a]ll agreed that the second subdivision plan met all zoning and use criteria." *Id.* The city argued that the city code and La. Rev. Stat. 33:101.1 gave them broad powers and discretion in approving of the proposed subdivision. *Id.* at 229.  A resident testified who had voiced opposition. *Id.*  The trial court issued an opinion that found that the city had "virtually boundless discretion" that was not violated in the case. *Id.*

37

On appeal, the plaintiff's first assignment of error was that the city had acted arbitrary and capriciously in denying the subdivision plan when they had complied with all applicable ordinances and when they had already approved two earlier phases of the subdivision. *Id.* at 230. The plaintiff contended they were denied the "use by right of its own property." *Id.*  The Plaintiff argued that, to deny a use by right, the defendants must satisfy strict scrutiny. *Id.*  The defendant responded by relying on the council's legislative discretion under the city ordinance and La. Rev. Stat. 33:101.1.

The Louisiana Second Circuit agreed with the plaintiff.  The appellate court explained:

> In the recent case of *D'Argent Properties LLC v. City of Shreveport, supra,* this court considered the analogous situation of a landowner who applied for site plan, completely in compliance with all zoning ordinances, to build a drive-in restaurant. In that case, the MPC had approved the site plan, but on appeal the city council denied it, with members citing "the betterment of the area" and "the majority of the citizens." On judicial review, the district court upheld the denial of the fully compliant site plan, citing the "broad legislative prerogative and decision-making authority" conferred by *King v. Caddo Parish Comm'n* and *Prest v. Parish of Caddo, supra.*

On appeal, however, this court found those authorities inapplicable:

> > [W]e distinguish *King v. Caddo Parish Comm'n, supra, Prest v. Parish of Caddo, supra,* and several other cases cited in brief, on a factual basis. Those cases all involved requests for variances, special exceptions or rezoning of a particular parcel. When an owner seeks to alter the established zoning, the commission or governing body must apply its great discretion and, as a result, the courts will not "take issue with the council." *King v. Caddo Parish Comm'n, supra.* The instant case, by contrast, is the *res nova* situation in which an owner seeks a use by right, in compliance with the applicable zoning, conforming to every modification imposed, and approved by the commission. This use by right should be presumptively valid and approved. For the council to deny such a use, the burden on the city is much higher. On judicial review, the council's decision to deny a use by right is subject to strict scrutiny, not the normal standard of broad discretion applied to variance cases. On this record, the city council did not meet its heightened burden of refuting the owners' use of right.

*Id.* at p. 5, 15 So.3d at 340 (footnote omitted).

38

Although the matter was *res nova* for Louisiana, this court cited *Hessee Realty Inc. v. City of Ann Arbor,* 61 Mich.App. 319, 232 N.W.2d 695 (1975), and *Bateson v. Geisse,* 857 F.2d 1300 (9 Cir. 1988), which applied similar reasoning and reached the same conclusion. This court was unable to find any contrary authority.

The instant case is analogous to *D'Argent.* Like the landowner applying for approval of a site plan that complied with all applicable zoning requirements, [the plaintiff] has applied for approval of a subdivision plan that complies with all applicable zoning and use requirements. Despite the sweeping language of R.S. 33:101.1 and Code § 82–41(a), which would appear to give the city virtually boundless discretion to grant or deny an application, we will apply, as in *D'Argent,* strict scrutiny to the decision to deny a fully compliant application.

*Id.* at 231 (footnote omitted).  The appellate court concluded:

In short, some of the reasons offered for denying the instant subdivision plan have no support in the record, and others, while factual, do not satisfy the constitutional requirement under [La. Const.] Art. 6, § 17, of "uniform procedures established by law" or meet the heightened burden of denying a fully compliant applicant, recognized in *D'Argent, supra.* We are also guided by the principle that zoning and land use regulations are construed in favor of the owner's proposed use of his own property. *Wright v. DeFatta,* 244 La. 251, 152 So.2d 10 (1963); *D'Argent Properties LLC v. City of Shreveport, supra; Residents of Shenandoah Estates Subd. v. Green Trails LLC,* 2005–1331 (La.App. 1 Cir. 6/9/06), 938 So.2d 1027, *writ denied,* 2006–2098 (La.12/8/06), 943 So.2d 1095. On this record, we are constrained to find the [planning commission] and city council abused their discretion in denying approval of Urban Housing's fully compliant subdivision plan.

*Id.* at 232.  Thus, *Urban Housing* seems to suggest, like the Court found in its earlier ruling, that the Planning Commission lacked unlimited or broad discretion.

But *Urban Housing* must be read in light of the later *GBT Realty*, which provided guidance for interpreting it and more directly addresses the question of the Planning Commission's discretion for purposes of imposing liability.  In *GBT Realty*, the Louisiana Second Circuit affirmed the rejection of a tort claim for denial of a building site plan.  In *GBT Realty*, the plaintiffs were property developers who wanted to build a Dollar General store in

Shreveport. *Id.* at 459.  The plaintiffs submitted plans to the city planning commission, and the staff "found no problems with the submitted plans." *Id.* at 460.

A public hearing was held with the planning commission, which "expressed concerns about the similar store in operation across the street and about the building façade and the proposed landscaping." *Id.*  The vote was deferred so that the developers could address those issues.  *Id.*

The plaintiffs later returned before the planning commission with an improved plan that included an upgraded façade and landscape plan. *Id.*  The planning commission ultimately rejected the plan because it (1) did not comply with recently proposed zoning suggestions to the city's master plan, and (2) the "consensus was that the site was too small to accommodate the proposed plan." *Id.*

The city council unanimously upheld the planning commission's decision.  One councilman said that "the size of the property vis-à-vis the proposed use was a big problem" *Id.* He said that residents made some valid points. *Id.*

The plaintiffs later appealed and asked the district court to approve of the initial site plan. *Id*. The district court overturned the council's decision. *Id.*

The plaintiffs filed suit against the city and the planning commission.  They claimed that the proposed site complied with the zoning law and that the stated reasons were "contrived." *Id.* at 461.  At trial, the plaintiffs' engineer testified that "the proposed store was a use by right under the zoning for the property and that other Dollar General stores had been approved with the same basic design." *Id.*  The city's witnesses acknowledged that there were no violations of city ordinances. *Id.*

The district court concluded that the plaintiffs could not recover because of Louisiana Revised Statute 9:2798.1, which provides in part that "Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties." La. Rev. Stat. § 9:2798.1(B).  The trial court further found that "despite the use by right zoning for the property, the City had discretion to disapprove the site plan, particularly in light of the provisions of the Shreveport City Code governing the approval process that ensure a safe, efficient, attractive and well-ordered community." *Id.* The court concluded that the "the City merely exercised its discretion under the applicable rules and did so in light of the policymaking considerations cited by Councilman Jenkins." *Id.*

The *GBT Realty* thoroughly reviewed *D'Argent* and *Urban Housing*, as well as one additional case.  The *GBT Realty* court explained that, "[a]lthough the instant case is a tort action and not a disapproval *vel non* case, jurisprudence involving disapproval of use by right is informative to determine the City's exposure to tort liability." *Id.* at 462.  After this thorough review, the *GBT Realty* court concluded:

> What these cases demonstrate is that a municipality must abide by its own zoning ordinances and apply them consistently through the site and subdivision plan approval process without "looking at each situation on a purely *ad hoc* political basis." [(citation omitted)]  **However, importantly, the cases further establish that a municipality has the discretion to act within the ambit of the zoning ordinances so long as that discretion is not exercised arbitrarily and capriciously.** A municipality retains the discretion to deny a site or subdivision plan submitted in accordance with use by right zoning, but that denial is subject to strict scrutiny and the zoning ordinances and actions will be construed in favor of the use proposed by the owner.
>
> **Thus we reject the appellants' contention that the City had "no" discretion to deny their site plans for the construction of the Dollar General store.**

41

*Id.* at 463 (emphasis added).  Turning to the facts, the Louisiana Second Circuit determined that

the Plaintiffs were not entitled to recover:

> The record supports the district court's conclusion that the City's action in this case, although ultimately overturned, was a discretionary act genuinely based in the City's attempt to ensure that the use of the property comported with the public interest in a safe and well-ordered community. Unmistakably, some of the City's proposed justifications for denying the plans were improper; for example, the plans' failure to comply with potential future land use rules was never a proper consideration. The City—again—failed to give the proper respect to the use by right zoning for this property.

> However, the City had *some* discretion in the choice to approve the site plans, and that choice was based in part upon various reasonable grounds such as the plans' provision for access into and out of this type of store and the detrimental effect on traffic, and thus public safety, that the proposed access allowed. The subsequent judicial determination that these concerns were inadequate to deny the plan does not equate to a finding that the City's action based on those concerns was "not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists." Likewise, the district court's conclusion that the City's actions were related to its legitimate objectives and not misconduct was, on this record, not plainly wrong. In this case, the store tenant, Dollar General, itself did not approve the site plan after it had been approved by the district court; instead, the retailer asked the plaintiffs to change the site plan's proposed access to the property prior to agreeing to a final plan. Clearly the access issue was a genuine concern for all of the parties here.

> In no way is this conclusion intended to diminish the strict scrutiny that must be given to the disapproval of use by right site plans upon direct review. However, recovery of tort damages against a public entity, even for a wrongly denied use by right case, requires proof of wrongdoing not found in this case.

*Id.* at 464—65.

While slightly distinguishable, the Court finds *GBT Realty* instructive.  *GBT Realty*

specifically recognizes that *Urban Housing* ultimately "establish[es] that a municipality has the

discretion to act within the ambit of the zoning ordinances so long as that discretion is not

exercised arbitrarily and capriciously." *Id.* at 463.  As in *GBT Realty*, this Court has already

determined in the above substantive due process section that the Planning Commission did not

act arbitrarily and capriciously in its denial of the preliminary plat.  Thus, as a matter of state

law, the Planning Commission did have discretion to deny the Plaintiffs' preliminary plat.

Given that discretion, the Plaintiffs cannot prevail on their due process claim.  First, they

cannot demonstrate that there was a "very strong likelihood" of approval.  Again, as this Court

has explained:

> The "strong likelihood" aspect of *Yale Auto Parts* comes into play only when the
> discretion of the issuing agency is so narrowly circumscribed that approval of a
> proper application is virtually assured; an entitlement does not arise simply
> because it is likely that broad discretion will be favorably exercised.

*Homeowner/Contractor Consultants*, 32 F. Supp. 2d 392 (quoting *RRI Realty Corp. v. Inc. Vill.

of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989)).  As demonstrated above in the substantive

due process section, the Plaintiffs have not demonstrated that approval was "virtually assured."

Second, the "strong likelihood" standard is merely intended to answer the larger question

of whether there was discretion.  *See Town of Castle Rock, Colo.*, 545 U.S. at 756, 125 S. Ct. at

2803 ("a benefit is not a protected entitlement if government officials may grant or deny it in

their discretion.").  Here, *GBT Realty* demonstrates that, as a matter of state law, the Planning

Commission had discretion to deny the preliminary plat under the circumstances.  For this

additional reason, the Plaintiffs have no property interest, and their due process claim fails. *See

RRI Realty Corp.*, 870 F.2d at 918 ("When a local regulator's discretionary decision to deny an

application is not arbitrary or capricious, the plaintiff will usually be deemed not to have a

sufficient entitlement to constitute a protected property interest.").

This ruling is also consistent with the Court's earlier ruling on the motion to dismiss.  In

the Plaintiffs' Petition, they stated that the "individual commissioners all voted against approving

the Preliminary Plat using criteria that is contrary to law" and the Planning Commission's

"reason for . . . denial was on account of the opposition to the Preliminary Plat by local

landowners who desired for the Property to remain undeveloped." (Doc. 1-2 at 5.)  They further alleged that the rejection was "on grounds of public outcry." (*Id.* at 11.)

At the motion to dismiss stage, the Court was required to assume the truth of these allegations.  Based on those allegations, the Court properly determined that the Planning Commission lacked discretion and that there was a very strong likelihood the preliminary plat would be approved.

The difference here is that the Defendants' motion must be decided on the factual record submitted by the parties.  As discussed above in the substantive due process section, here the record demonstrates that the Planning Commission did in fact base its decision on legitimate reasons and on data submitted at this hearing and others.  Thus, while the motion to dismiss may have been properly denied because of the allegations of the Petition, here the record demonstrates that, in fact, the Planning Commission did have discretion and that approval was not a "certainty" or "virtually assured."

In sum, for the above reasons, the Court finds that summary judgment is appropriate on this issue.   Accordingly, the Plaintiffs' procedural due process claim is dismissed with prejudice.[4]

### C.  Ripeness of Federal and State Takings Claims

#### 1.The Parties' Arguments

##### a.  The Defendants' Memorandum in Support

The Defendants claim that "[a] takings claim under the Fifth Amendment to the United States Constitution and Article I, § 4 of the Louisiana Constitution is not ripe until the claimant has unsuccessfully attempted to obtain just compensation through the procedures provided by the

---

[4] Given the Court's holding, it need not address whether the second due process requirement (deprivation) was satisfied.

state for obtaining such compensation." (Doc. 62-1 at 4 (citing *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 193—94, 105 S. Ct. 3108, 3120, 87 L. Ed. 2d 126 (1985)).)

The Defendants correctly assert that, under Fifth Circuit law, "[a] takings claim is not ripe until (1) the relevant governmental unit has reached a final decision as to what will be done with the property and (2) the plaintiff has sought compensation through whatever adequate procedures the state provides." *Sandy Creek Inv'rs, Ltd. v. City of Jonestown, Tex.*, 325 F.3d 623, 626 (5th Cir. 2003).

The Defendants argue that, under the first prong, a case is not ripe (1) "when a case involves a matter that has not been finally decided[,]" and (2) "when the property owner has 'ignored or abandoned some relevant form of review or relief, such that the taking decision cannot be said to be final.' " (Doc. 62-1 at 4 (quoting *Urban Developers, LLC v. City of Jackson*, 468 F.3d 281, 293 (5th Cir. 2006)).)  According to the Defendants, the Plaintiffs here have ignored the Louisiana Administrative Procedure Act procedure set forth in La. Rev. Stat. 49:964(G). The Defendants contend that the Plaintiffs failed to avail themselves of state law remedies, so the matter is unripe.

The Defendants also state that, under the second prong, "a movant must . . . show that compensation for the alleged taking has duly been sought and denied via all available administrative procedures." (Doc. 62-1 at 5 (citing *Williamson Cty.*, 473 U.S. at 186—87).)  The Defendants assert that, "[i]f a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."  (Doc. 62-1 at 5—6 (citing *Williamson Cty.*, 473 U.S. at 186—87).)  According to the Defendants, the "Fifth Circuit has

45

interpreted this requirement as meaning that a plaintiff asserting a takings claim must first

'present its inverse condemnation action to the state court in a posture such that the state court

could rule on [the] claim,' before coming to federal court." (Doc. 62-1 at 6 (quoting *Liberty Mut.*

*Ins. Co. v. Brown*, 380 F.3d 793, 798 (5th Cir. 2004)).)

      Similarly, the Louisiana Supreme Court has recognized an inverse condemnation action

under Louisiana law.  According to the Defendants, the Plaintiffs must use this procedure before

coming to federal court.

      The Defendants then argue:

> Notably, the record reflects that the Plaintiffs in this matter did, in fact, file an
> inverse condemnation claim in state court in their original petition. [(Doc. 1-2 at
> 9.)]  However, the case was removed to federal court by Defendants.
> Nonetheless, the federal takings claim will not be ripe unless and until Plaintiffs
> are denied just compensation on that state claim for inverse condemnation.
> Defendants' choice to remove the inverse-condemnation action does not waive
> the subject-matter jurisdiction aspect of ripeness." (Doc. 62-1 at 6 (citations
> omitted).) Plaintiffs in this matter failed to request remand of their takings claim.
> [(citation and footnote omitted).]  Because Plaintiffs have not exhausted the
> available state remedies first, its § 1983 claim under the Fifth Amendment is not
> ripe as a matter of law.

(Doc. 62-1 at 6.)

### b.  The Plaintiffs' Opposition

      The Plaintiffs argue that "[t]he *Williamson County* ripeness requirement is prudential, not

jurisdictional, and thus may be waived." (Doc. 73 at 3 (citations omitted).)  Further, the Plaintiffs

argue that this "ripeness requirement does not apply to actions brought in state court, since a

state court may hear 'simultaneously a plaintiff's request for compensation under state law and

the claim that, in the alternative, the denial of compensation would violate the Fifth Amendment

of the Federal Constitution.' " (Doc. 73 at 4 (citation omitted).)  Plaintiffs state that this is

exactly what they did when they filed suit in state court.

The Plaintiffs also note that the Defendants are wrong to say that they could have sought review of "agency" action under La. Rev. Stat. 49:964.  According to the Plaintiffs, "this provision does not apply to the decisions of local governmental bodies like the" Planning Commission. (Doc. 73 at 4 n. 18 (emphasis in original) (citing La. Rev. Stat. 9:951(2); *Brossette v. Alcoholic Beverage Control Bd.*, 1994-0781 (La. App. 1 Cir. 5/5/95); 655 So. 2d 536, 538).) The Plaintiffs argue they "pursued the correct procedural course by instituting the present action." (*Id.*)

The Plaintiffs thus contend:

> Plaintiffs' petition, as originally filed in state court, contained a takings claim which was indisputably ripe.  The subsequent removal of the case did not magically render that claim "unripe;" rather, by removing the case to a federal forum, Defendants waived any challenge that might have existed under *Williamson County* to the ripeness of the claim.  As courts have recognized, Defendants cannot remove to federal court and then (years later no less) use their removal as grounds for a ripeness argument.

(Doc. 73 at 4 (footnotes omitted).)

### c.  The Defendants' Reply

The Defendants reply that the "Supreme Court has determined that when a ripeness question in a particular case is prudential, it may be raised on the Court's own motion, and 'cannot be bound by the wishes of the parties.' " (Doc. 76 (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 138, 95 S. Ct. 335, 356, 42 L. Ed. 2d 320 (1974)).)  The Defendants argue they are not manipulating litigation; rather, the Plaintiffs "have actually had years to recognize that their inverse condemnation claim should have been remanded to state court for proper adjudication." (Doc. 76 at 2.)  Lastly, the Defendants argue that "courts of judicial review have repeatedly deferred and recognized the necessity of an intermediary court exercising appellate review of an agency adjudication." (*Id.* (footnote omitted).)

## 2. Analysis

As stated above, "[a] takings claim is not ripe until (1) the relevant governmental unit has reached a final decision as to what will be done with the property and (2) the plaintiff has sought compensation through whatever adequate procedures the state provides." *Sandy Creek Inv'rs, Ltd.*, 325 F.3d at 626. The Court will address each in turn.

### a.   The First *Williams County* Requirement: Final Decision

The first issue is whether there was a "final decision" by the "relevant governmental unit" concerning the property. *Id.* The Fifth Circuit has stated:

> In adopting the first prong, the [*Williams County*] Court explained its reluctance to hear premature takings claims as follows:
>
>> "this Court consistently has indicated that among the factors of particular significance in the [*Penn Central*] inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question."

*Urban Developers LLC v. City of Jackson, Miss.*, 468 F.3d 281, 293 (5th Cir. 2006) (quoting *Williamson County*, 105 S.Ct. at 3118–19 (citations omitted)). The Fifth Circuit then explained:

> For example, in *Penn Central* the Court declined to hold that New York City's Landmarks Preservation Law effected a taking as applied to Grand Central Terminal, reasoning that although the City had disapproved a plan for a 50–story building above the terminal, the property owners had not sought approval for an alternative plan, and it was therefore uncertain whether the City would disapprove of all economically beneficial uses of the land. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S. Ct. 2646, 2665–66, 57 L.Ed.2d 631 (1978); *see also Agins v. City of Tiburon,* 447 U.S. 255, 100 S. Ct. 2138, 65 L.Ed.2d 106 (1980), overruled on other grounds by *First English Evangelical Lutheran Church v. Los Angeles County,* 482 U.S. 304, 107 S. Ct. 2378, 96 L.Ed.2d 250 (1987) (rejecting a takings claim as unripe because the property's owner had not submitted a plan for development). **This means that even if a plan is initially disapproved by the government, property owners must then seek variances or waivers, *when potentially available*, before a court will hear their takings claims.** *Williamson County,* 105 S.Ct. at 3117; *Hodel v. Virginia Surface Mining*

48

> *& Reclamation Assn., Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 2371, 69 L.Ed.2d 1 (1981). **This court has also held that whenever the property owner has ignored or abandoned some relevant form of review or relief, such that the takings decision cannot be said to be final, the takings claim should be dismissed as unripe.** *Hidden Oaks Ltd. v. City of Austin,* 138 F.3d 1036, 1041 (5th Cir.1998).

*Id.* (emphasis added). Thus, in *Urban Developers LLC*, the Fifth Circuit found that the first

prong was not satisfied because:

> When [Plaintiff] Urban Developers was notified that the Mod Rehab contracts wouldn't be renewed, it suspended its plans to rehabilitate Town Creek [apartments] and abandoned all avenues of review that were available to it. *See Hidden Oaks,* 138 F.3d at 1041. [Plaintiff's principal member] admitted this at trial[.] . . . Urban Developers submitted two building plans for approval by the City, both of which were rejected because they did not comply with the City's flood-zone ordinance. **After this rejection, although represented by counsel, Urban Developers neither applied for a floodplain-development permit,** *nor pursued mandamus against the City's community development officer,* **nor availed itself of the appeal process set forth in the City of Jackson municipal code, which provides any person affected by an order issued by a housing official with an appeal to the circuit court of the First Judicial District of Hinds County.** Like the Court in *Penn Central,* we cannot evaluate the extent to which the City has interfered with Urban Developers' reasonable investment-backed expectations because no final decision has been made, nor even sought, regarding the application of the flood-zone ordinance. Accordingly, we dismiss as unripe Urban Developers' regulatory takings claim against the City of Jackson.

*Id.* at 293–94 (emphasis added).

Here, it is uncontested that the Planning Commission discussed and evaluated the

Plaintiffs' preliminary plat at the January 2013 public hearing.  The Planning Commission

decided to delay a final decision and give the Plaintiffs an opportunity to make certain changes to

the plan.  The Plaintiffs did so, yet, despite this, the Planning Commission eventually voted in

April to deny approval for the preliminary plat.  Importantly, the Defendants have identified no

specific permit, variance, or administrative appeal process that the Plaintiffs should have pursued

but did not.  The Defendants only point to one: relief from the courts, either through the

Louisiana Administrative Procedure Act or through some other general review process.

Putting aside the former,[5] the Court agrees with the Defendants that *Mercan, Inc. v. City of Baton Rouge*, 2000-0600 (La. App. 1 Cir. 5/11/01); 797 So.2d 722, reflects that denials of subdivision plans are subject to judicial review.  There, a developer filed suit after the planning commission had denied approval of a proposed subdivision, resulting in "a taking without due process." *Id.* at 723.  The trial court found that the planning commission did not act arbitrarily and capriciously in denying the Plaintiffs permit. *Id.*  On appeal, the Louisiana First Circuit held that the Plaintiff had no cause of action and concluded "that before [the plaintiff] can make a claim for damages against the City/Parish, it must give the courts the opportunity to rectify the alleged arbitrary, capricious or abusive conduct. [The plaintiff] has not done so. Therefore, it now lacks a cause of action against the City/Parish." *Id.* at 724.

However, unlike the plaintiffs in *Mercan* and *Urban Developers LLC*, the Plaintiffs here *did*  provide "an opportunity to rectify the alleged . . .  [mis]conduct" because it "pursued [a] mandamus" against the Planning Commission in which they sought approval of the preliminary plat. (*See* Petition, Doc. 1-2 at 6-7.)  Moreover, there has even been a final decision on that writ of mandamus; in ruling on the Defendants' motion to dismiss, this Court found that the Plaintiffs' claim was moot because they had sold the property. (Doc. 36 at 10—11.)  Thus, unlike the above cases, the Planning Commission's decision with respect to the Plaintiffs' preliminary plat is certain and final.

---

[5] The Court agrees with the Plaintiffs that the Louisiana Administrative Procedure Act does not apply here. Louisiana Revised Statute 49:964(G) provides that "[t]he court may affirm the decision *of the agency* or remand the case for further proceedings," or the court may "reverse or modify the decision" under certain circumstances. La. Rev. Stat. 49:964(G).  Section 9:951(2) specifically excludes from the definition of "agency" commissions of political subdivisions. La. Stat. Ann. § 49:951(2); *see also Brossette v. Alcoholic Beverage Control Bd.*, 94-0781 (La. App. 1 Cir. 5/5/95); 655 So. 2d 536, 538 ("it is well established that the APA's definition of "agency" does not include a political subdivision nor any "board" of such an entity. La. R.S. 49:951(2).").

The Defendants point to an (unauthenticated) email in support of their argument that there was no final decision.  In the email, dated April 23, 2013 (the day after the Plaintiffs' preliminary plat was denied by the Planning Commission), counsel for the Plaintiffs emailed Troy Bunch, former Director of the Planning Commission asking, "Should I file suit or so [sic] you think there is an alternative course of action?" (Doc. 62-13.)  Bunch replied, "Your future action is up to you and your client.  There is no waiting period to re-apply or your client could modify the application or follow the existing rules and regulations." (*Id.*)

Even if the Court were to consider this unauthenticated document, the Court finds that it does not support the Defendants' position.  The email provides virtually no answer to the Plaintiffs' question of what the Plaintiffs should have done next to obtain review.  To the extent it does, the email suggests that filing suit would be an appropriate next step.  This is precisely what the Plaintiffs did.  Finally, by the Defendants' logic, no taking claim could ever be ripe, because modification or reapplication is theoretically always available for an applicant.

Accordingly, the Court finds that the first prong of the *Williamson County* analysis is satisfied.  The Court will now proceed to the second.

### b.  The Second *Williams County* Requirement: Utilizing of State Law Procedures

This Court has explained:

In order to satisfy the second prong of the *Williamson County* test, a property owner may not claim a violation of just compensation until pursuing whatever adequate procedures the State offers for seeking just compensation, such as an inverse condemnation action. *Williamson,* 473 U.S. at 196–97. A plaintiff must allow a state court to rule upon its inverse condemnation, or otherwise similar appropriate remedy, action before bringing the action to federal court. *Liberty Mut. Ins. Co. v. Brown,* 380 F.3d 793, 798 (5th Cir.2004). . . . Louisiana law recognizes an inverse condemnation action as a means of seeking just compensation. *See State Through Dept. of Transp. & Dev. v. Chambers Inv. Co.*, 595 So.2d 598, 602 (La. 1992).

51

*Bienville Quarters, LLC v. E. Feliciana Par. Police Jury*, No. 07-158, 2010 WL 2653317, at \*2 (M.D. La. June 25, 2010).  The Defendants acknowledge that the Plaintiffs filed an inverse condemnation claim in state court, but they argue that their own removal of the action to federal court somehow makes the claim unripe.

The Court rejects the Defendants' argument.  The Plaintiffs are correct that "the Supreme Court has . . . explicitly held that *Williamson County*'s ripeness requirements are merely prudential, not jurisdictional, so although a court may raise them *sua sponte,* it may consider them waived or forfeited as well."  "*Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 88–89 (5th Cir. 2011) (citations omitted).

The Plaintiffs are also correct that *"Williamson County* [does not] prohibit[] plaintiffs from advancing their federal claims in state courts." *San Remo Hotel, L.P. v. City & Cty. of San Francisco, Cal.,* 545 U.S. 323, 346, 125 S. Ct. 2491, 2506, 162 L. Ed. 2d 315 (2005).  The Supreme Court has explained:

> The requirement that aggrieved property owners must seek "compensation through the procedures the State has provided for doing so," [*Williamson County,*] 473 U.S., at 194, 105 S. Ct. 3108, does not preclude state courts from hearing simultaneously a plaintiff's request for compensation under state law and the claim that, in the alternative, the denial of compensation would violate the Fifth Amendment of the Federal Constitution. Reading *Williamson County* to preclude plaintiffs from raising such claims in the alternative would erroneously interpret our cases as requiring property owners to "resort to piecemeal litigation or otherwise unfair procedures." *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 350, n. 7, 106 S. Ct. 2561, 91 L. Ed. 2d 285 (1986).

*Id.*  Thus, the Plaintiffs acted properly in bringing in state court their federal takings claim with their inverse condemnation claim.

The Court is persuaded by *Sansotta v. Town of Nags Head*, 724 F.3d 533 (4th Cir. 2013), which was also cited by the Plaintiffs.  There, the appellate court held that the district court erred

in dismissing the plaintiffs' takings claim as unripe because the town had waived this requirement by removing the case to federal court. *Id.* at 544.

The *Sansotta* court began by explaining how, under *Williamson County*, a plaintiff must first seek compensation from the state via the procedures that the state has established before suing the state in federal court and how, "[b]ased on this requirement, a plaintiff cannot simultaneously bring a claim for compensation under state law and a claim under the Takings Clause in federal court; rather, the plaintiff must first pursue his state-law claim for compensation." *Id.* (citations omitted). The Court then recognized the above rule from *San Remo Hotel, L.P.* that a state court can hear simultaneously a claim for compensation under state law and an alternative claim for denial of compensation under the Fifth Amendment. *Id.* (citing *San Remo Hotel, L.P.*, 545 U.S. at 346, 125 S. Ct. at 2506).

The Court stated that "the Williamson County state-litigation requirement involves only prudential considerations," so the Court "may determine that in some instances, the rule should not apply and we still have the power to decide the case." *Id.* at 545 (citations omitted). The *Sansotta* court then found that "[t]his case is such an instance. Allowing the Town to invoke the *Williamson County* state-litigation requirement after removing the case to federal court would fail to fulfill the rationale for this prudential rule and would create the possibility for judicially condoned manipulation of litigation." *Id.*

As to the first reason, the Fourth Circuit explained that the purpose behind the state-litigation requirement is that state courts have more experience than federal courts in the factual and legal issues surrounding zoning and land-use regulations. *Id.* (citations omitted). However, federal courts remain capable of deciding the issues, and defendants implicitly recognize this

when they remove such cases to federal court. *Id.* "Thus, the primary reason for the *Williamson County* state-litigation requirement no longer applies when the defendant removes a case." *Id.*

As to the second reason (manipulation of litigation), the Fourth Circuit analogized the case to the rule that a defendant who removes a case to federal court waives Eleventh Amendment immunity. *Id.* at 545—46 (citing *Lapides v. Bd. of Regents of the Univ. Sys. of Ga*, 535 U.S. 613, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002)).  In *Lapides*, Supreme Court explained:

> It would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the "Judicial power of the United States" extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the "Judicial power of the United States" extends to the case at hand. And a Constitution that permitted States to follow their litigation interests by freely asserting both claims in the same case could generate seriously unfair results.

*Id.* at 546 (quoting *Lapides*, 535 U.S. at 619, 122 S. Ct. 1640).  According to the Fourth Circuit, "The Court was so intent on preventing any manipulation that it created a bright-line rule: any voluntary removal waives immunity." *Id.* (citation omitted).  Turning to its own case, the *Sansotta* court explained:

> Here, if we substitute "the *Williamson County* state-litigation requirement" for "Eleventh Amendment immunity," the logic is precisely the same. Like Eleventh Amendment immunity, a state or its political subdivision is entitled to assert the state-litigation requirement when a plaintiff files suit in federal court. But permitting a state or its political subdivision to assert this requirement after the state or its political subdivision has removed the case to federal court would allow the state or its political subdivision to do in the context of the Takings Clause exactly what the Supreme Court has declared to be improper in the context of the Eleventh Amendment: invoke federal jurisdiction and then object to federal jurisdiction.

> Applying the reasoning of *Lapides* to the Takings Clause and *Williamson County* is both logically and legally sound. First, this reasoning does nothing to undermine the core rationale of *Williamson County,* as a plaintiff cannot bring a takings claim in federal court without having been denied just compensation by the state; such a claim can come into federal court before the state has denied compensation only when the state or its political subdivision chooses to remove the case to federal court. Second, it protects an innocent plaintiff who sought to

comply with *Williamson County* and *San Remo Hotel* but whose efforts were thwarted by the state or political subdivision's decision to remove the case. Third, it prevents a state or its political subdivision from manipulating litigation by removing to federal court claims properly filed in state court in accordance with *San Remo Hotel* and then claiming that the plaintiff cannot proceed on those claims, thereby denying a plaintiff *any* forum for having his claim heard. Fourth, and relatedly, it furthers our "strong preference for deciding cases on the merits" by preventing any procedural gamesmanship. *Heyman v. M.L. Mktg. Co.,* 116 F.3d 91, 94 (4th Cir. 1997).

*Id.* at 546—47.

The Fourth Circuit also expressly rejected the argument advanced by the Defendants here – that the Plaintiffs should have sought remand.  The Fourth Circuit explained that the plaintiffs "had no basis to seek to have [the district] court remand any claims to the state court." *Id.* (citations omitted).  After the case was removed, "federal jurisdiction was proper, and the district court was obligated to exercise that jurisdiction unless it had a legal basis, such as abstention, to refrain from exercising that jurisdiction." *Id.* at 547 (citation omitted).

The Court finds the *Sansotta* case highly persuasive.  All of the reasons cited by the *Sansotta* court appear sound and reasonable.  Most relevant, the Court finds the Defendants' efforts on this issue stink of litigation manipulation.  For these reasons, the Court will apply *Sansotta* and find that the Defendants have waived any objection to this *Williamson County* requirement.  Thus, *Williamson County* does not preclude the Plaintiffs' takings claims, and they are ripe for adjudication.

### D.  Federal Takings Claims

#### 1. The Parties' Arguments

##### a.  The Defendants' Memorandum in Support

The Defendants acknowledge that the Plaintiffs are asserting a regulatory taking and admit that, in ruling on the Defendants' motion to dismiss, the Court identified the correct factors

in determining whether such a taking has occurred.  These facts are (1) "the economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." (Doc. 62-1 at 7 (citing *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124, 98 S. Ct. 2646, 2659, 57 L. Ed. 2d 631 (1978)).)

The Defendants argue that the first factor weighs against the Plaintiffs.  The Defendants assert that the Plaintiffs have sold much of their 57.7 acres for over one million dollars. According to the Defendants, "a diminution in value does not establish a taking." (Doc. 62-1 at 8 (citing *Jackson Court Condominiums, Inc. v. City of New Orleans*, 874 F.2d 1070, 1080 (5th Cir. 1989)).)  Moreover, the Defendants reject the Plaintiffs' argument that they suffered economic hardship because their profits from the proposed subdivision would have gone toward paying various judgments; the Defendants state, "Plaintiffs' poor financial decisions and legal troubles do not vitiate the fact that they made a substantial profit.  The law does not contemplate any losses or financial obligations incurred by Plaintiffs as a result of their personal decision to default on loans or breach contracts with third-parties." (Doc. 62-1 at 8.)

Concerning the second *Penn Central* factor, the Defendants argue that investment-backed expectations "must be more than a unilateral expectation or an abstract need," that the Plaintiffs must show that they were "denied the ability to exploit a property interest that they heretofore had believed was available for development," and that "[o]ne who buys with knowledge of a restraint assumes the risk of economic loss." (Doc. 62-1 at 9 (citations and quotations omitted).) The Defendants argue that the Plaintiffs were familiar with the discretionary nature of the approval process for subdivision plats and that this familiarity means that they had no reasonable investment-backed expectations:

> Plaintiffs' expectation about the subject property would not be 'investment-backed' unless they actually believed in a certain outcome and bought the property in reliance on it.  Clearly, based on their own testimony, it is unreasonable for Plaintiffs to assert that they bought investment property in reliance on the nonexistence of any regulations, most of all, regulations set forth for the creation of subdivisions.

(Doc. 62-1 at 10.)

Concerning the third *Penn Central* factor, the Defendants contend that "*Penn Central* noted that a taking is more readily found when the interference is a physical invasion than when the interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." (Doc. 62-1 at 10 (citing *Penn Central*, 438 U.S. at 124).) The Defendants contend that, since the taking here was regulatory, "there is no governmental intrusion whatsoever." (*Id.*)  The Defendants state that, "[t]he challenged action in this case is the failed approval of a preliminary plat for a proposed subdivision, which squarely falls under the authority of local ordinances, and specifically the [UDC].  The regulation does not deprive Plaintiffs of absolute use or ownership of their property."  (*Id.* at 10—11.)  Thus, under the *Penn Central* factors, no taking has occurred.

### b.  The Plaintiffs' Opposition

The Plaintiffs begin by referring to the Court's ruling on the Defendants' motion to dismiss.  In that ruling, the Court found that, by alleging that the Planning Commission had deprived the Plaintiffs of "all economically beneficial use" of the Property, the Plaintiffs had stated a claim for a *per se* or "categorical" taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 12 S Ct. 2886, 120 L. Ed. 2d 798 (1992). (Doc. 73 at 5 (citing Doc. 36 at 14).)  The Plaintiffs contend that the Defendants did not address this claim in their motion, so it survives summary judgment.

The Plaintiffs continue by stating that, even if the issue had been raised, it would survive summary judgment.  The Plaintiffs argue:

> The holding of *Lucas* was that "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, *to leave his property economically idle,* he has suffered a taking." [505 U.S. at 1010, 12 S. Ct. at 2895 (emphasis added).]  Thus, "regulations that leave the owner of land without economically beneficial or productive options for its *use-typically, as here, by requiring land to be left substantially in its natural state-carry* with them a heightened risk that private property is being pressed into some form of public service under the guise of  mitigating serious public harm." [505 U.S. at 1010, 12 S Ct. at 2894—95.]  "As *Lucas* elaborates, categorical assessment of an alleged taking is appropriate when the property is purportedly without *economically viable use,* and does not require the parcel to be without all accounting or appraisal value. Both in its holding and its reasoning, *Lucas* thus focuses on whether a regulation permits economically viable use of the property, not whether the property retains some value on paper." [*Resource Investments Inc. v. United States*, 85 Fed. Cl. 447, 486 (2009) (footnotes omitted).]

(Doc. 73 at 5.)  The Plaintiffs argue that the Defendants have submitted no evidence that the Plaintiffs had another economically viable "use" of the property after the Planning Commission's action.  Rather, the Defendants focus solely on property values, which is not the appropriate inquiry here.  While the Plaintiffs (like the plaintiff in *Lucas*) were free to sell the property, they were not free to use the property in any economically beneficial way.

The Plaintiffs also devote considerable attention to the *Penn Central* analysis.  The Plaintiffs begin by citing to numerous cases for the proposition that Courts are generally reluctant to decide *Penn Central* issues at the summary judgment stage because they are so fact-intensive. (Doc. 73 at 6 (citations omitted).)

After listing factors to consider in assessing the economic effect on the claimant, the Plaintiffs assert that the Defendants' focus on the fact that the property was sold for a gross profit is misplaced; the key is "how the regulation impacted the value of the Property, *i.e.*, what the Property might have sold for before the [Planning Commission] foreclosed the highest and best

use of that Property." (*Id.*)  The Plaintiffs' evidence demonstrates the " 'before and after' effect of the Planning Commission's action on its property and investment-backed profit expectations"; the Defendant's evidence simply shows that property appreciates over time. (*Id.* at 7—8.) "Plaintiffs could have sold the Property, vacant and undeveloped, at any time; it was the fact they were prevented from using their Property as permitted by law, *i.e.*, developing the Property into the low-density subdivision . . . that is the basis of Plaintiffs' complaint." (*Id.* at 8.)

Concerning the reasonableness of the investment-backed expectations, the Plaintiffs contend that the "law requires an objective, but fact-specific inquiry into what, under all the circumstances, [the Plaintiffs] should have anticipated." (*Id.* (citations omitted).)  According to the Plaintiffs, the sole contention by the Defendants on this point is that, because the subdivision required approval by the Planning Commission, it was not reasonable for the Plaintiffs to have any expectations."  Relying on case law, the Plaintiffs assert that the existence of laws and regulations does not *per se* prevent expectations for the development; rather, this is a factor in the analysis. (*Id.* (citations omitted).)  The key question is whether a reasonable person would have considered it probable that the project would be approved.  The Plaintiffs maintain that they have satisfied this standard.

Finally, concerning the final *Penn Central* factor (the character of the governmental action), the Plaintiffs argue that this factor is either neutral or weighs in their favor.  They contend they were denied a use of right protected by Louisiana law.

### c.  The Defendants' Reply

The Defendants first claim that they are in fact challenging whether the Plaintiffs have a *Lucas* taking and that the Plaintiffs cannot prove that they were deprived of "all economically beneficial use" of their property.  The Defendants argue that, in *Tahoe—Sierra Preservation*

*Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 303 (2002), the Supreme Court noted that "*Lucas* was carved out for the 'extraordinary case' in which a regulation **permanently** deprives property of all use; the default rule remains that a fact specific inquiry is required in the regulatory taking context." *Id.* (emphasis added).  The Defendants claim they did not engage in a *Lucas* analysis because *Lucas* "clearly does not apply." The Defendants claim they had use of their property because they sold it for over one million dollars.

Concerning the as applied takings claim, the Defendants argue that the Plaintiffs were not "economically deprived in any manner." (Doc. 76 at 4.)  In a footnote, they cite to the numerous sales of property and to the approval of a smaller subdivision on the subject property that the Plaintiffs sold.

Moreover, the Defendants contend that they dispute that the Plaintiffs would gain $1.3 million in profit from the subdivision development.  The Defendants also contend that there were no reasonable expectations because the property at issue was being foreclosed upon.  According to the Defendants, there can be no reasonable expectation that the development would have been completed without an adversary action as a result of the foreclosure, and the "Plaintiffs were only able to stop the foreclosure actions with the proceeds from the sales of the property." (Doc. 76 at 5 n. 6.)  Thus, according to the Defendants, the Plaintiffs lost not because of the Planning Commission but through "their own doing via the satisfaction of any and all foreclosure judgments rendered against them." (*Id.*)

### d.  The Plaintiffs' Surreply

Concerning the categorical taking (*Lucas*) claim, the Plaintiffs argue that the Defendants cannot implicitly challenge this claim and rely on their assertion that "*Lucas* clearly does not

apply."  Rather, the Defendants had to expressly raise the issue in their motion, and they failed to do so.

Concerning the merits of the *Lucas* claim, the Plaintiffs reiterate that there is a difference between a land's "use" and its "value," and "it is the deprivation of any 'economically beneficial *use*" of the land, *i.e.*, "regulations that leave the owner of land without economically beneficial or productive options for its use—typically, as here, by requiring land to be left substantially in its natural state,' that *Lucas* expressly targets for treatment as a categorical taking." (Doc. 80 at 3 (citation omitted).)  The Plaintiffs claim that the "Defendants have introduced absolutely no evidence of any other 'economically beneficial *use*' that Plaintiffs could have made of this particular property." (Doc. 80 at 3.)

Concerning the *Penn Central* factors, the Plaintiffs argue that there are no facts that dispute their claim that the Plaintiffs would have earned $1.3 million in profits (beyond the value of the land).

### 2.  The General Framework of Regulatory Takings Claims

In *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S. Ct. 2074, 2080, 161 L. Ed. 2d 876 (2005), the Supreme Court explained:

> The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, see *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897), provides that private property shall not "be taken for public use, without just compensation." As its text makes plain, the Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). In other words, it "is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id.,* at 315, 107 S.Ct. 2378 (emphasis in original).

*Id.*, 544 U.S. at 536–37, 125 S. Ct. at 2080. "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Id.*,

544 U.S. at 537, 125 S. Ct. at 2081 (citations omitted). "Beginning with *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922)], however, the Court recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster-and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Id.* The Supreme Court then explained:

> Our precedents stake out two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes. First, where government requires an owner to suffer a permanent physical invasion of her property-however minor-it must provide just compensation. See *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of "*all* economically beneficial us[e]" of her property. *Lucas,* 505 U.S., at 1019, 112 S. Ct. 2886 (emphasis in original). We held in *Lucas* that the government must pay just compensation for such "total regulatory takings," except to the extent that "background principles of nuisance and property law" independently restrict the owner's intended use of the property. *Id.,* at 1026-1032, 112 S. Ct. 2886.

> Outside these two relatively narrow categories (and the special context of land-use exactions discussed below, see *infra,* at 2086-2087), regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S. Ct. 2646, 57 L.Ed.2d 631 (1978). The Court in *Penn Central* acknowledged that it had hitherto been "unable to develop any 'set formula' " for evaluating regulatory takings claims, but identified "several factors that have particular significance." *Id.,* at 124, 98 S. Ct. 2646. Primary among those factors are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Ibid.* In addition, the "character of the governmental action"-for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good"-may be relevant in discerning whether a taking has occurred. *Ibid.* The *Penn Central* factors-though each has given rise to vexing subsidiary questions-have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules. See, *e.g., Palazzolo v. Rhode Island,* 533 U.S. 606, 617-618, 121 S. Ct. 2448, 150 L.Ed.2d 592 (2001); *id.,* at 632-634, 121 S. Ct. 2448 (O'CONNOR, J., concurring). . . .

> Although our regulatory takings jurisprudence cannot be characterized as unified, these three inquiries (reflected in *Loretto, Lucas,* and *Penn Central* ) share a

common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights. The Court has held that physical takings require compensation because of the unique burden they impose: A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property-perhaps the most fundamental of all property interests. See *Dolan v. City of Tigard,* 512 U.S. 374, 384, 114 S. Ct. 2309, 129 L.Ed.2d 304 (1994); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 831-832, 107 S. Ct. 3141, 97 L.Ed.2d 677 (1987); *Loretto, supra,* at 433, 102 S. Ct. 3164; *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S. Ct. 383, 62 L.Ed.2d 332 (1979). In the *Lucas* context, of course, the complete elimination of a property's value is the determinative factor. See *Lucas, supra,* at 1017, 112 S. Ct. 2886 (positing that "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation"). And the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.

*Id.*, 544 U.S. at 538—40, 125 S. Ct. at 2081—82. Thus, "a plaintiff seeking to challenge a government regulation as an uncompensated taking of private property may proceed . . . by alleging a "physical" taking, a *Lucas*-type "total regulatory taking," [or] a *Penn Central* taking[.]"[6] *Id.*, 544 U.S. at 548, 125 S. Ct. at 2087.

Here, *Lucas* and *Penn Central* takings claims have been made. The Court will address each in turn.

### 3. The Categorical Takings (*Lucas*) Claim

The categorical takings claim requires an analysis of a procedural issue and a substantive issue. The first issue is whether the claim is properly before the Court. The Court finds that it is. The second issue is whether, assuming the claim can be considered, summary judgment is warranted. The Court finds that it is because no reasonable juror could conclude that the Plaintiffs suffered a "complete elimination of [the] property's value."

---

[6] The Supreme Court identified a fourth type, but it is not at issue here.

### a. Procedural Issue

The Plaintiffs contend that the *Lucas* claim should not even be addressed because the Defendants did not argue the issue in their original memorandum in support.  The Plaintiffs point to *Baker v. Metropolitan Life Insurance Co.*, 364 F.3d 624 (5th Cir. 2004), which held that, "a district court may not grant summary judgment *sua sponte* on grounds not requested by the moving party." *Id.* (citations omitted).  The Defendants claim that the issue was implicitly raised and obvious.

The Court finds that it will consider the issue.  The Court bases its decision on *Atkins v. Salazar*, 677 F.3d 667 (5th Cir. 2011).

In *Atkins*, the Fifth Circuit explained that, "[d]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Id.* at 678 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  "Put simply, '[s]ummary judgment is improper if "[t]here was no reason for the [nonmoving party] to suspect that the court was about to rule on the motion." ' " *Atkins*, 677 F.3d at 678 (quoting *Resolution Trust Corp. v. Sharif–Munir–Davidson Dev. Corp.*, 992 F.2d 1398, 1402 (5th Cir.1993)).  "Under this standard, '[the Fifth Circuit has] vacated summary judgements [sic] and remanded for further proceedings where the district court provided no notice prior to granting summary judgment *sua sponte*, even where summary judgment may have been appropriate on the merits.' " *Atkins*, 677 F.3d at 678 (quoting *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1398 (5th Cir.1994)).

The facts of *Atkins* are particularly noteworthy.  There, the Fifth Circuit found that the district court did not err in granting summary judgment on the basis of a particular defense,

despite the fact that the defendant did not raise the issue in its opening brief, because (1) the
"[plaintiff] *himself* raised the . . . defense in his summary judgment response brief"; (2) the
defendant "made repeated references to facts relevant to the . . . defense in its opening brief" ;
and (3) though the defendant raised the defense in its reply brief, the plaintiff filed a surreply
addressing it, thereby eliminating the concern that the defendant would have the "final word" on
the issue. *Atkins*, 677 F.3d at 679—81 (emphasis in original). The Fifth Circuit concluded:

> In sum, [the plaintiff] raised the business necessity himself in his reply brief and
> later elaborated upon it in his sur-reply. Whether or not he had formal notice from
> the district court, [the plaintiff] was aware that the defense was at play and had a
> full opportunity to argue against it and present whatever relevant evidence he had.
> Notice from the district court that it intended to rely on the affirmative defenses
> would have made no difference to [the plaintiff's] briefing and so the lack of
> notice caused [the plaintiff] no harm.

*Id.* at 681.

The Court finds *Atkins* directly on point. As in *Atkins*, the Plaintiffs themselves raised
the *Lucas* claim in their original opposition. The Defendant's original brief contains
considerable evidence about the economically beneficial use of the Plaintiff's property, as that
overlaps with the *Penn Central* analysis. Finally, the Plaintiff got the last word by filing a
surreply. According, the Court will decide this claim.

### b. Substantive Issue

The next issue is whether the *Lucas* claim should be dismissed on the merits. The Court
finds that it should.

A review of *Lucas* is appropriate at the outset. In *Lucas*, the petitioner paid almost a
million dollars for two residential lots on an island. 505 U.S. at 1006—07, 112 S. Ct. at 2889.
He intended to build homes there. *Id.* Two years later, the state legislature enacted a statute
"which had the direct effect of barring [him] from erecting any habitable structures on his two

parcels." *Id.*, 505 U.S. at 1007, 112 S. Ct. at 2889.  He filed suit alleging a taking without just compensation. *Id.*, 505 U.S. at 1007, 112 S. Ct. at 2890.

The Court recognized that it found "categorical treatment appropriate . . . where regulation denies all economically beneficial or productive use of land." *Id.*, 505 U.S. at 1015—16, 112 S. Ct. at 2893-94 (citations omitted).  The Court explained that "the Fifth Amendment is violated when land-use regulation "*denies an owner economically viable use of his land.*" *Id.*, 505 U.S. at 1016, 112 S. Ct. at 2894 (emphasis in original).

In explaining the reason for this rule, the Court explained that it was "[p]erhaps" because "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation. For what is the land but the profits thereof?" *Id.*, 505 U.S. at 1017, 112 S. Ct. at 2894 (citations, alterations, and quotations omitted).  Further:

> the *functional* basis for permitting the government, by regulation, to affect property values without compensation—that Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law,—does not apply to the relatively rare situations where the government has deprived a landowner of all economically beneficial uses.
>
> On the other side of the balance, affirmatively supporting a compensation requirement, is the fact that regulations that leave the owner of land without economically beneficial or productive options for its use—typically, as here, by requiring land to be left substantially in its natural state—carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm. . . .
>
> We think, in short, that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.

*Id.*, 505 U.S. at 1018—19, 112 S. Ct. at 2894—95 (emphasis in original) (citations and quotations omitted).

66

Writing for the majority, Justice Scalia also responded to an objection by the dissent, stating:

> Justice STEVENS criticizes the "deprivation of all economically beneficial use" rule as "wholly arbitrary," in that "[the] landowner whose property is diminished in value 95% recovers nothing," while the landowner who suffers a complete elimination of value "recovers the land's full value." . . . It is true that in at least *some* cases the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full. But that occasional result is no more strange than the gross disparity between the landowner whose premises are taken for a highway (who recovers in full) and the landowner whose property is reduced to 5% of its former value by the highway (who recovers nothing). Takings law is full of these "all-or-nothing" situations.
>
> Justice STEVENS similarly misinterprets our focus on "developmental" uses of property (the uses proscribed by the Beachfront Management Act) as betraying an "assumption that the only uses of property cognizable under the Constitution are *developmental* uses." *Post,* at 2919, n. 3. We make no such assumption. Though our prior takings cases evince an abiding concern for the productive use of, and economic investment in, land, there are plainly a number of noneconomic interests in land whose impairment will invite exceedingly close scrutiny under the Takings Clause. See, *e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 436, 102 S.Ct. 3164, 3176, 73 L.Ed.2d 868 (1982) (interest in excluding strangers from one's land).

*Id.*, 505 U.S. at 1019 n. 8, 112 S. Ct. at 2895.  The Supreme Court concluded that, because the trial court found that the petitioner's lots had been rendered "valueless," he was entitled to compensation under this theory. *Id.*, 505 U.S. at 1020, 112 S. Ct. at 2896.  The Court later held that the state supreme court committed error when it applied the "harmful or noxious uses" principle in the case and ultimately remanded for the state court to determine if common law principles (like nuisance) would have prevented the building of "any habitable or productive improvements on petitioner's land." *Id.*, 505 U.S. at 1031—32, 112 S. Ct. at 2901—02.

Thus, *Lucas* recognizes that a regulation "denies all economically beneficial or productive use of land" when there is "the equivalent of a physical appropriation," 505 U.S. at 1017, 112 S. Ct. at 2894, when land is effectively "pressed into some form of public service," 505 U.S. at 1018, 112 S. Ct. at 2895, when the landowner "has been called upon to sacrifice *all*

economically beneficial uses in the name of the common good," 505 U.S. at 1019, 112 S. Ct. at 2895, when he must "leave his property economically idle," *id.*, and when he "suffers a complete elimination of value," 505 U.S. at 1019 n. 8, 112 S. Ct. at 2895.

Thus, *Lucas* is somewhat ambiguous and does not appear to answer the question of whether a categorical takings claim survives if the owner is able to sell his property for a million dollars.  As one federal appellate court noted, the *Lucas* court "used the term 'use' synonymously with the term 'value.' " *Lost Tree Vill. Corp. v. United States*, 787 F.3d 1111, 1115 (Fed. Cir. 2015) (citing *Lucas*, 505 U.S. at 1019 n. 8, 112 S .Ct. 2886).

However, the Supreme Court provided guidance on how to interpret *Lucas* in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002).  There, "[t]he question presented [was] whether a moratorium on development imposed during the process of devising a comprehensive land-use plan constitutes a *per se* taking[.]" *Tahoe-Sierra*, 535 U.S. at 306, 122 S. Ct. at 1470.  The Supreme Court held that it was not.  In doing so, the Court stated:

> The categorical rule that we applied in *Lucas* states that compensation is required when a regulation deprives an owner of "*all* economically beneficial uses" of his land. *Id.,* at 1019, 112 S. Ct. 2886. Under that rule, a statute that "wholly eliminated the value" of Lucas' fee simple title clearly qualified as a taking. But our holding was limited to "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Id.,* at 1017, 112 S. Ct. 2886. The emphasis on the word "no" in the text of the opinion was, in effect, reiterated in a footnote explaining that the categorical rule would not apply if the diminution in value were 95% instead of 100%. *Id.,* at 1019, n. 8, 112 S. Ct. 2886. Anything less than a "complete elimination of value," or a "total loss," the Court acknowledged, would require the kind of analysis applied in *Penn Central. Lucas,* 505 U.S., at 1019–1020, n. 8, 112 S.Ct. 2886.

*Tahoe-Sierra*, 535 U.S. at 330, 122 S. Ct. at 1483.  The Court further explained that the categorical taking cases, including *Lucas*, "make clear that the categorical rule in *Lucas* was carved out for the 'extraordinary case' in which a regulation permanently deprives property of *all*

*value*; the default rule remains that, in the regulatory taking context, we require a more fact specific inquiry." *Id.*, 535 U.S. at 332, 122 S. Ct. at 1484 (emphasis added).

Dissenting, Chief Justice Rehnquist took the position now advanced by the Plaintiffs. He criticized the Court for interpreting *Lucas* to mean only value, writing:

> The Court also reads *Lucas* as being fundamentally concerned with value, *ante,* at 1482–1484, rather than with the denial of "all economically beneficial or productive use of land," 505 U.S., at 1015, 112 S.Ct. 2886. But *Lucas* repeatedly discusses its holding as applying where "*no* productive or economically beneficial use of land is permitted. [(citations omitted)].

*Tahoe-Sierra*, 535 U.S. at 350, 122 S. Ct. at 1493 (Rehnquist, C.J., dissenting). However, as demonstrated above, the *Tahoe-Sierra* majority clearly rejected this position.

Similarly, in *Lingle*, the Supreme Court again interpreted *Lucas*, explaining that:

> A second categorical rule applies to regulations that completely deprive an owner of "*all* economically beneficial us[e]" of her property. *Lucas,* 505 U.S., at 1019, 112 S. Ct. 2886 (emphasis in original). We held in *Lucas* that the government must pay just compensation for such "total regulatory takings," except to the extent that "background principles of nuisance and property law" independently restrict the owner's intended use of the property. *Id.,* at 1026-1032, 112 S .Ct. 2886.

544 U.S. at 538, 125 S. Ct. at 2081. The Court further stated, "In the *Lucas* context, of course, the complete elimination of a property's value is the determinative factor. *See Lucas, supra*, at 1017, 112 S. Ct. 2886 (positing that "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation")." *Lingle*, 544 U.S. at 539—40, 125, S. Ct. at 2082. Thus, both *Tahoe-Sierra* and *Lingle* indicate that *value* is the key inquiry in a *Lucas* claim.

The Court found conflicting circuit case law on whether a plaintiff can bring a *Lucas* claim when he is able to sell his property. *Compare Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430 (8th Cir. 2007) (affirming trial court's holding that, even if *Lucas* applied to real property, the plaintiff did not suffer a loss of all economically beneficial use of his gaming

69

machines when it "could sell [the] machines (e.g. salvage value) or reconfigure the . . . machines for a different use"), *with Lost Tree Vill. Corp. v. United States*, 787 F.3d 1111, 1113 (Fed. Cir. 2015) ("When there are no underlying economic uses, it is unreasonable to define land *use* as including the sale of the land. Typical economic uses enable a landowner to derive benefits from land ownership rather than requiring a landowner to sell the affected parcel.").

The Court also found several district court cases holding that there was no *Lucas* claim when the owner could sell his property. *See Brian B. Brown Const. Co. v. St. Tammany Par.*, 17 F. Supp. 2d 586, 590 (E.D. La. 1998) ("plaintiff's sale to an outside investor [after the commission and police jury's decision denying approval to develop its property] would appear to negate any claim that it has been denied all economically beneficial uses of its property."); *Prewitt v. City of Rochester Hills*, 105 F. Supp. 2d 724, 729–30 (E.D. Mich. 2000), *vacated in part*, 54 F. App'x 817 (6th Cir. 2002) ("plaintiffs' [taking] claims . . . are defeated because plaintiffs are bound by the administrative findings that the property in question has not been rendered valueless. . . . In the present case, the state board adopted the administrative law examiner's finding that plaintiffs' house, even in its current condition, could be sold to a purchaser interested in doing the restoration work if plaintiffs would reduce their asking price and/or intensify their marketing efforts. This finding conclusively establishes that the denial of the demolition permit has not resulted in the loss of all reasonable beneficial use of plaintiffs' house"); *Rzadkowolski v. Twp. of Metamora*, No. 14-12480, 2016 WL 2756518, at *6 (E.D. Mich. May 12, 2016*), order vacated in part on reconsideration sub nom. Rzadkowolski v. Metamora Twp.*, No. 14-12480, 2016 WL 3230535 (E.D. Mich. June 13, 2016) (finding that Plaintiff could not demonstrate that he was deprived of all economically beneficial value or productive use of the land "because it is undisputed that his property still retains economic value,

per a letter from the township tax assessor who stated on August 25, 2015 that the property has a true cash value of $8,000, which is only $200 less than what Plaintiff paid for it."); *Nammari v. Town of Winfield*, No. 2:07-CV-306, 2008 WL 4757334, at *11 (N.D. Ind. Oct. 29, 2008) ("as Plaintiffs admit that they sold their ownership interest in Doubletree Estate, it is implausible that they were denied 'all economically beneficial' use of the land.").

Having carefully considered both sides of the issue, the Court finds that the appropriate question is whether the Plaintiffs were deprived of *all value* in the property. Regardless of any ambiguity in *Lucas*, later Supreme Court cases make clear that, to prevail on a categorical taking claim, the property must lose *all value*. *See Tahoe-Sierra*, 535 U.S. at 332, 122 S. Ct. at 1484; *Lingle*, 544 U.S. at 539—40, 125, S. Ct. at 2082. Further, *Hawkeye Commodity* and the other district court cases are persuasive on this point.

Applying that standard to the facts in the record, the Court finds that the Plaintiff's *Lucas* claim fails. The Plaintiffs sold much of the property for over a million dollars, and this demonstrates that they were not deprived of all value in their property. No reasonable juror could conclude otherwise. Thus, the Plaintiffs' *Lucas* claim is dismissed.

Finally, even assuming that the question was whether the Plaintiffs had an economically viable *use* in their property (as opposed to *value*), the Court finds that summary judgment would still be warranted. Here, it is uncontested that, after the Planning Commission denied approval of the Mallard Trails subdivision, the Plaintiffs submitted and obtained approval of another subdivision that contained parts of the original Mallard Trails subdivision. (Doc. 62-2 at 8; Doc. 73-1 at 7—8.). Based on this fact, no reasonable juror could conclude that the Plaintiffs were denied *all* economic beneficial use of their entire 57.5 acres. *See Tahoe-Sierra*, 535 U.S. at 330, 122 S. Ct. at 1483 ("But our holding in *Lucas* was limited to the extraordinary circumstance

when *no* productive or economically beneficial use of land is permitted. The emphasis on the word 'no' in the text of the opinion was, in effect, reiterated in a footnote explaining that the categorical rule would not apply if the diminution in value were 95% instead of 100%.") (citations and quotations omitted)); *Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (owner was not deprived of economically beneficial use of its property where regulation at issue still allowed the owner to mine 50 percent of the value of its coal).

Accordingly, summary judgment is warranted on the Plaintiffs' categorical takings claim. This claim is dismissed.

### 4. The As-Applied Takings Claim

The Court must now examine the *Penn Central* factors. These factors include (1) the "economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action," *Penn Cent.*, 438 U.S. at 124, 98 S. Ct. at 2659 (citations omitted). Regulatory takings "necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Tahoe-Sierra*, 535 U.S. at 323, 122 S. Ct. at 1479. Having carefully weighed these factors and the facts in the record, the Court finds that genuine issues of material fact preclude summary judgment on this claim.

Concerning the first factor, the "test for regulatory taking requires [Courts] to compare the value that has been taken from the property with the value that remains in the property[.]" *Keystone Bituminous Coal Ass'n,*, 480 U.S. at 497, 107 S. Ct. at 1248.  That is, they examine changes in market value. *See Hodel v. Irving,* 481 U.S. 704, 714—15, 107 S. Ct. 2076, 2082— 83, 95 L. Ed. 2d 668 (1987).  However, "[t]he Fifth Amendment prohibition against taking

without compensation does not guarantee the most profitable use of property, and a diminution in value, standing alone, does not establish a taking." *Jackson Court Condominiums, Inc. v. City of New Orleans*, 874 F.2d 1070, 1080 (5th Cir. 1989) (citations omitted).  Additionally, the Court can consider for this factor other economic benefits that the owner can derive from his property. *Andrus v. Allard*, 444 U.S. 51, 66, 100 S. Ct. 318, 327, 62 L. Ed. 2d 210 (1979).  However, "[w]hen analyzing the economic impact of a regulation, the 'loss of anticipated gains or potential future profits' is typically not considered." *Hackbelt 27 Partners, L.P. v. City of Coppell*, No. 15-11109, 2016 WL 5396660, at *5 (5th Cir. Sept. 27, 2016) (applying Texas law and citing *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 935 (Tex. 1998), which in turn relied upon *Andrus v. Allard*, 444 U.S. at 66); *see also Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1268 (Fed. Cir. 2009) (stating that "the vast majority of takings jurisprudence examines, under *Penn Central*'s economic impact prong, not lost profits but the lost value of the taken property" and collecting cases on same).

Here, the Plaintiffs have submitted evidence demonstrating that they were deprived of the ability to build the subdivision of their choice on their property, which is a loss in value.  They also provided the Plaintiffs' affidavit, which reflects a $1.3 million loss in profits. (Doc. 73-10 at 3.)  As stated above, the Court cannot consider this fact for this prong.  Lastly, the Plaintiffs filed an expert report indicating that the property at issue diminished in value in the amount of roughly $1.3 million. (Doc. 73-7 at 22.)  This would tend to support the Plaintiffs' argument.  However, that report also demonstrates that the land actually increased in value after the denial and that the $1.3 million calculation is based on lost profits. (Doc. 73-9 at 10.)  This would tend to undercut the expert's conclusions.  Under these circumstances, including the conflicts in the expert's report, the Court finds this factor neutral at this time.

The Court now turns to the second factor, interference with investment-backed expectations.  "The existence of a regulatory regime does not per se preclude all investment-backed expectations for development." *Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354, 1364 (Fed. Cir. 2000).  Rather, "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations." *Palazzolo*, 533 U.S. at 633, 121 S. Ct. at 2466 (O'Connor, J., concurring). As one federal circuit court explained:

> The purpose of consideration of plaintiffs' investment-backed expectations is to limit recoveries to property owners who can demonstrate that "they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." This factor also incorporates an objective test—to support a claim for a regulatory taking, an investment-backed expectation must be "reasonable." . . . The critical question is whether a reasonable developer confronted with the particular circumstances facing the Owners would have expected the government [action] . . . This is an objective, but fact-specific inquiry into what, under all the circumstances, the Owners should have anticipated.

*Cienega Gardens v. United States*, 331 F.3d 1319, 1345–46 (Fed. Cir. 2003) (citations omitted).

Applying these standards, the Court finds that this factor weighs strongly in favor of the Plaintiffs.  The Court recognizes that, above, it held that the Plaintiffs have not shown that it was "certain" that they would obtain approval.  But the question here is not whether there was a "certainty." The question is whether a reasonable juror could conclude that, given (1) the Plaintiffs' compliance with the UDC and the Planning Commission's additional requests, and (2) the recommendation of the Planning Commission staff and the Department of Public Works, the Plaintiffs should have reasonably anticipated obtaining approval.  The Court thinks that the Plaintiffs meet this standard, at least enough to survive summary judgment. The line is fine, but the Court believes it appropriate here.

Further, the Plaintiffs have submitted evidence that they would have earned a profit of over $1.3 million dollars if Mallard Trails had been developed. (Doc. 73-10 at 3.) The Court agrees with the Plaintiffs that the Defendants have presented no evidence demonstrating that this amount was unreasonable or incorrect.  The fact that the property may have been in foreclosure does not mean, as a matter of law, these expectations were unreasonable.  In sum, this factor weighs in favor of the Plaintiffs.

The final factor is the character of the government action.  The Supreme Court has advised that, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124, 98 S. Ct. at 2659.

Preliminarily, the Court notes that there is "a clear distinction between substantive due process analysis and Fifth Amendment takings analysis." *Rose Acre Farms, Inc.*, 559 F.3d at 1276 (citing *Lingle*, 544 U.S. at 540, 125 S. Ct. 2074). *See also* Robert G. Dreher, *Lingle's Legacy: Untangling Substantive Due Process From Takings Doctrine*, 30 Harv. Envtl. L. Rev. 371, 402 (2006) ("[*Lingle*] rejects any normative component to takings law based on considerations of the efficacy or wisdom of the government's actions.").  "We can no longer ask whether the means chosen by government advance the ends or whether the regulation chosen is effective in curing the alleged ill. All those concerns, albeit relevant concerns in many cases dealing with governmental regulations, are now confined to a substantive due process inquiry." *Rose Acre Farms, Inc.*, 559 F.3d at 1278 (citing *Equity Lifestyle Props., Inc. v. County of San Luis Obispo*, 548 F.3d 1184, 1194 n. 17 (9th Cir. 2008) ("Due process violations cannot be

remedied under the Takings Clause ...." (citing *Lingle*, 544 U.S. at 543, 125 S. Ct. 2074)).  Thus, the Court's finding in the substantive due process section is not dispositive here.

Thus, for this factor, courts should consider "the actual burden imposed on property rights, or how that burden is allocated." *Id.* at 1278 (citing *Lingle*, 544 U.S. at 543, 125 S. Ct. 2074).  The Court also examines "the *magnitude or character of the burden* that a particular regulation imposes upon private property rights" as well as "how any regulatory burden is *distributed* among property owners." *Id.* at 1279 (emphasis in original).  Moreover, Courts should examine the "harm-preventing purpose of a regulation" – that is, whether the "restrictions were directed at the protection of public health and safety." *Id.* at 1281 (citations omitted).

Analyzing the relevant considerations for this factor, the Court finds that it likely weighs in favor of the Defendants.  The restrictions appear directed at least in part at public safety.  While there was a burden placed on the Plaintiffs' ability to build on their property, the regulatory burden of the Planning Commission is distributed equally across the community; as stated above, without more information about the nature of other projects in the area that were approved, the Court cannot determine at this time whether the Plaintiffs were singled out.

Given the findings on the three *Penn Central* factors, the Court concludes that this fact-intensive inquiry is best left to a jury.  For these reasons, the Court denies the Defendants' motion on this issue.

### E.  The *Monell* Claim

#### 1. The Parties' Arguments

The Defendants' next argument centers on whether the Plaintiffs have established municipal liability under 42 U.S.C. § 1983. As Defendants correctly assert, "municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a

violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't. of Soc. Servs.,* 436 U.S. 658, 694, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978)).

The Defendants appear to attack each requirement, though at times indirectly. Concerning the first, the Defendants state that the "Planning Commission members vote to approve each matter that comes before them; they are not a policy-making body." (Doc. 62-1 at 19.)  Concerning the second requirement, the Defendants contend that, for the following reasons, the Plaintiffs cannot prove an official policy: (1) because, by merely declining to approve of the preliminary plat, the Planning Commission made no statement of policy; (2) because this case involves solely state and local laws, so no federal laws were violated; and (3) because there is no evidence of deliberate indifference by any policymaker.  Concerning the third *Monell* requirement, the Defendants maintain that, because the Plaintiffs' other constitutional claims fail, the Plaintiff's municipal liability claim also fails.

In response, the Plaintiffs argue that a policy can be established "based on an isolated decision made in the context of a particular situation if the decision was made by an authorized policymaker in whom final authority rested regarding the action ordered." (Doc. 73 at 12 (citing *Cozzo v. Tangipahoa Par. Council—President Gov't*, 279 F.3d 273, 289 (5th Cir. 2002)).  The Plaintiffs state that this requirement is satisfied because state and local laws vest the Planning Commission with final decision making authority over approval of subdivision plats.

In reply, the Defendants claim that the Plaintiffs do "nothing more than assert conclusory allegations." (Doc. 76 at 9.)  According to the Defendants, the Plaintiffs are subject to a heightened pleading requirement for allegations of a municipal custom.  The Defendants assert

that the Plaintiffs cannot prove any of the three *Monell* requirements and that their claims consequently fail.

In a surreply, the Plaintiffs argue that there is no heightened pleading requirement for *Monell* claims.  The Plaintiffs reiterate that this Court already found that they stated a valid claim under *Monell*.

## 2. Analysis

The Court finds that the Plaintiffs have demonstrated a genuine issue of fact precluding summary judgment on their *Monell* claim.  The Fifth Circuit has explained:

> The first requirement for imposing municipal liability is proof that an official policymaker with actual or constructive knowledge of the constitutional violation acted on behalf of the municipality. *Cox v. City of Dallas, Tex.,* 430 F.3d 734, 748–49 (5th Cir. 2005). A policymaker is "one who takes the place of the governing body in a designated area of city administration." *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984) (en banc). He or she must "decide the goals for a particular city function and devise the means of achieving those goals." *Bennett v. City of Slidell,* 728 F.2d 762, 769 (5th Cir. 1984) (en banc). . . . A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) "it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role."

*Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010).

Here, the Planning Commission is a policymaker.  State law vests the Planning Commission with control over the authority and regulation of subdivision plats.  The following statutes demonstrate this:

- La. Rev. Stat. §  33:101.1 provides that, "[e]xcept as otherwise provided in this Subpart, the act of approving or disapproving a subdivision plat is hereby declared a legislative function involving the exercise of legislative discretion by the planning commission, based upon data presented to it; . . ."

- La. Rev. Stat. § 33:110 states that, "[i]n general, a commission shall have such powers as may be necessary to enable it to fulfill its functions, promote planning, and in all respects carry out the purposes of this Sub-part."

- La. Rev. Stat  § 33:111 provides that, whenever a planning commission has adopted a major street or road plan, individuals or corporations must obtain written approval from the planning commission before filing or recording a plat.  This section further states that "failure to do so shall constitute the right of the governing authority wherein said land is located not to accept same as a duly accepted and dedicated subdivision."

- La. Rev. Stat. § 33:112(A) and (B) require parish and municipal planning commissions to adopt "regulations governing the subdivision of land within [their] jurisdiction" "[b]efore exercising the powers referred to in R.S. 33:110."

Each of these statutes supports the conclusion that planning commissions are policymakers within their jurisdictions with respect to the approval of subdivision plats.

Similarly, East Baton Rouge Parish has vested authority in the Planning Commission in accordance with state law.  UDC § 1.1 provides the authority for and policy behind the adoption of the regulations contained in the code:

In accordance with the provisions of R.S. 33:101 et seq., and particularly R.S. 33:112, and in order to promote the health, safety, convenience, morals, and general welfare of the community, to ensure orderly development of property; provide for the proper arrangement, width, naming of streets in relation to other existing or planned streets that provide adequate and convenient traffic circulation including access for emergency vehicles; and ensure the adequacy of vehicular parking, utilities, and open space and recreation facilities, the following regulations [i.e., the UDC] are adopted by the Planning Commission.

(Doc. 73-2 at 1). UDC § 1.2 states that, "Every subdivision of land or site or tract development . . . within the jurisdiction of the Parish . . .  shall be shown upon a plat and submitted to the Planning Commission for approval or disapproval.") (Doc. 73-2 at 1).  UDC § 3.04(B) also provide:

Upon adoption of the Master Plan by the Planning Commission and Metropolitan Council, no subdivision, street, park or public way, ground or space, drainage, building development or structure, whether publicly or privately owned which is in conflict with the Master Plan or the Unified Development Code shall be constructed or authorized by the appropriate department of the City-Parish government, until and unless the locations and extent thereof shall have been

79

submitted to and approved by the Planning Commission and where appropriate,
Zoning Commission.

(Doc. 73-2 at 5); *see also* East Baton Rouge Plan of Government § 10.04(B), Doc 73-3 at 6, *also*

*available at* https://brgov.com/plan/ch10.htm (stating almost verbatim the same rule as UDC §

3.04).  Indeed, one of the parties' undisputed material facts is that the Planning Commission "is

charged with, among other things, the responsibility of review and approval of subdivision

plats." (Doc. 73-1 at 1.)

Thus, it is clear that, by formal act, the Planning Commission is the City/Parish's

policymaker with respect to the approval of subdivision plats.  The Planning Commission "takes

the place of [the Parish] in [this] designated area of city administration," and it "decide[s] the

goals for [this] particular city function and devise[s] the means of achieving those goals."

*Zarnow* 614 F.3d at 167.  Thus, the first requirement of *Monell* liability has been satisfied.

The second requirement has also been satisfied.  The Fifth Circuit has recognized that an

"[o]fficial policy is . . . [a] policy statement, ordinance, regulation, or decision that is officially

adopted and promulgated by the municipality's lawmaking officers or by an official to whom the

lawmakers have delegated policy-making authority." *Bennett v. City of Slidell*, 735 F.2d 861, 862

(5th Cir. 1984).  Thus, "[a] plaintiff may also establish a custom or policy based on an isolated

decision made in the context of a particular situation if the decision was made by an authorized

policymaker in whom final authority rested regarding the action ordered." *Cozzo v. Tangipahoa*

*Par. Council--President Gov't*, 279 F.3d 273, 289 (5th Cir. 2002) (citations omitted). Here, a

reasonable jury could conclude that the Planning Commission members officially rendered a

decision by disapproving of the Plaintiffs' preliminary plat and that this decision was made by an

authorized policymaker with knowledge and final authority on the matter.

The Defendants cite to no law holding that this is insufficient to constitute a policy for summary judgment purposes.  The Defendants are correct that, in the Fifth Circuit, "[t]he description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts."  *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).  But such facts are clear from the record: the rejection of the Plaintiffs' preliminary plat.  Even if there were a heightened pleading requirement here, which is doubtful,[7] the Plaintiffs would satisfy that hurdle.

Finally, the Court has already determined that there are questions of fact as to whether the Defendants violated the Plaintiffs' Fifth Amendment right against unlawful takings.  For similar reasons, the Court finds that a reasonable juror could conclude that the Planning Commission members' decision was the "moving force" of this constitutional violation, which clearly constitute violations of federal law.

Thus, the Plaintiffs' municipal liability claim survives.  The Defendants' motion for summary judgment on this issue is denied.

---

[7] The Supreme Court has recently stated in *Johnson v. City of Shelby, Mississippi*, 574 U.S. ____, 135 S.Ct. 346 (2014):

> Federal pleading rules call for "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. Rule Civ. Proc. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted. See Advisory Committee Report of October 1955, reprinted in 12A C. Wright, A. Miller, M. Kane, R. Marcus, and A. Steinman, Federal Practice and Procedure, p. 644 (2014 ed.) (Federal Rules of Civil Procedure "are designed to discourage battles over mere form of statement"); 5 C. Wright & A. Miller, § 1215, p. 172 (3d ed. 2002) (Rule 8(a)(2) "indicates that a basic objective of the rules is to avoid civil cases turning on technicalities"). **In particular, no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim.** ***See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993) (a federal court may not apply a standard "more stringent than the usual pleading requirements of Rule 8(a)" in "civil rights cases alleging municipal liability");** . . .

*Id.,* 135 S. Ct. at 346–347 (emphasis added).  In any event, this is a ruling on a motion for summary judgment, not a motion to dismiss.

### F.  State Law Takings Claim

#### 1. The Parties' Arguments

The Defendants assert that, under state law, a "regulatory taking occurs when a regulation destroys a major portion of the property's value or eliminates the practical economic uses of the property." (Doc. 62-1 at 11 (emphasis omitted).)  Here, according to the Defendants, the Plaintiffs were not deprived of a major portion of the property's value; the evidence shows that the Plaintiffs sold much of their property for over one million dollars.  Additionally, the Plaintiffs were not deprived of *all* economically beneficial use, as they were able to develop their property.

The Plaintiffs respond that the appropriate test was laid out by the Louisiana Supreme Court, and it does not consider whether a "major portion" has been eliminated.  Rather, this test looks at whether the government action has deprived a landowner of the property's "highest and best use." (Doc. 73 (citations omitted).)  Further, the Defendants ignore that "value" includes the lost profits that they could have received from developing the property.  Thus, the record evidence shows they lost more than half the value they might have expected to reap from their property.

The Defendants respond that the Plaintiffs' cited three-part test ignores the Court's previous ruling on the motion to dismiss.  Further, even if profits were considered, the Plaintiffs have profited over $1 million from the sale of their property.  Any additional damages would be a "windfall."

#### 2. Analysis

Article I, Section 4 of the Louisiana Constitution provides that "Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property.  This right is

subject to reasonable restrictions and the reasonable exercise of the police power." La. Const. art. I, § 4.  Section 4 further states, "Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit." *Id.*

As this Court explained in its ruling on the motion to dismiss, "[a]t issue here is a regulatory taking, which, under Louisiana law, 'occurs when the regulation destroys a major portion of the property's value or eliminates the practical economic uses of the property.' " (Doc. 36 at 17 (citing *State, Dept. of Soc. Servs. v. City of New Orleans*, 95-1757 (La. App. 4 Cir. 5/29/96); 679 So. 2d 149, 151; *Layne v. City of Mandeville*, 93-0046 (La. App. 1 Cir. 12/29/93); 633 So. 2d 608, 612).)

While, in the briefing for this motion, the parties appear to dispute the appropriate standard to apply, that issue appears to be resolved in the Plaintiffs' proposed jury instructions. There, the Plaintiffs cite to *State of Louisiana, Department of Social Services* (as well as an additional case) and recite the above rule on this issue from the Court's ruling on the motion to dismiss.  They also state that this is "an accurate recitation of the law." (Doc. 110 at 19—20.) Thus, the Court will consider the issue resolved.

Applying this standard, the Court finds that a question of fact exists as to whether a regulatory taking has occurred under Louisiana law.  As stated above, the Plaintiffs have presented evidence demonstrating that their property suffered a $1.3 million dollar depreciation in value.  (Doc. 73-7 at 22.)  While the Court determined above that the Plaintiffs could not prove that they were deprived of *all* value, here the standard is whether they were deprived of a *major portion* of the property's value.  The Court finds that, even considering the sale of the property, a reasonable juror could conclude that a $1.3 million dollar deprivation in value

constitutes a deprivation of a *major portion* of the property's value.  At the very least, this is a

question best left for the jury.  Accordingly, summary judgment on this issue is denied.

V.  **Conclusion**

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56

Filed by City of Baton Rouge/Parish of East Baton Rouge* (Doc. 62) is **GRANTED IN PART**

and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that the motion is **GRANTED** in that the following of

the Plaintiffs' claims are **DISMISSED WITH PREJUDICE:** (1) the substantive due process

claim, (2) the procedural due process claim, and (3) the categorical takings (*Lucas*) claim;

**IT IS FURTHER ORDERED** that, in all other respects, the Defendants' motion is

**DENIED.**  Trial will proceed on the following claims: (1) the as applied (*Penn Central*) takings

claim, (2) the *Monell* claim, and (3) the state law takings claim.

**IT IS FURTHER ORDERED** that, by Monday, October 24, 2016, at 12:00 p.m., the

parties shall file into the record trial briefs no longer than five pages addressing how this ruling

impacts the parties' currently pending motions in limine.  The parties shall also inform the Court

of which of their proposed jury instructions they wish to withdraw as no longer necessary.  The

parties are not entitled to file new motions in limine or seek the exclusion of additional evidence,

and they are not entitled to submit new proposed jury instructions.

Signed in Baton Rouge, Louisiana, on October 22, 2016.

_____

**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**